UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK WILLIAM DROESSER, *et al.*,

        Plaintiffs,

v.

                                 Civil Action No. 19-cv-12365
                                 HON. BERNARD A. FRIEDMAN

FORD MOTOR COMPANY,

        Defendant.

_____

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART FORD'S MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

Mark William Droesser, Jeffery A. Ford, Sr., Jeffery Fowlkes, Matthew Parker, Trevor Wentz, James Jason Meehan, Roger Saddler, Ricky J. Tremblay, Paul Ponteaux, Curtis McNeal Mertz, Joseph Sawicki, Sylvia Reeves, Sonja Bauers, Joey Angona, Eric Markovich, Luther Stidham, Vincent Doa, and Jay Eriv (collectively, "Plaintiffs") commenced this putative class action alleging that Ford Motor Company ("Ford") caused them out-of-pocket losses because of a diesel truck defect.

Before the Court is Ford's motion to dismiss the second amended class action complaint. (ECF No. 49). Plaintiffs responded in opposition. (ECF No. 53-54). Ford filed a reply. (ECF No. 55). The Court will decide the motion without a hearing pursuant to E.D. Mich. LR 7.1(f)(2). For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

# I.   PROCEDURAL HISTORY

Plaintiffs commenced this putative class action against Ford pursuant to Fed. R. Civ. P. 23. (ECF No. 1). Plaintiffs later filed the operative pleading, the Second Amended Class Action Complaint ("SAC"). (ECF Nos. 44, 45 *SEALED*).

Plaintiffs purchased 2011-present model year Ford trucks with a 6.7L Power Stroke diesel engine ("class vehicles"). The fuel injection system is equipped with the Bosch CP4.2 high-pressure fuel injection pump ("CP4 pump"). According to Plaintiffs, Ford concealed that the CP4 pump has a fragile and unstable design that contaminates the fuel injection system with metal shavings. Plaintiffs allege that the defect causes progressive failures that damage the CP4 pump, the fuel injection system, and the diesel engine, and can cause catastrophic failures that make the class vehicles shut off in motion without the ability to restart.

The eighteen named Plaintiffs purchased class vehicles in twelve states: Kansas (Droesser); Louisiana (Ford and Angona); Michigan (Fowlkes and Doa); Ohio (Parker, Meehan, and Saddler); Pennsylvania (Wentz); Florida (Tremblay and Ponteaux); California (Mertz and Sawicki); Alabama (Reeves); Indiana (Bauers); Illinois (Markovich); North Carolina (Stidham); and New Jersey (Eriv). Alleging that Ford has sold hundreds of thousands of class vehicles, Plaintiffs seek to represent a nationwide class of all purchasers and lessees, including fifty sub-classes for individual jurisdictions. The individual jurisdictions include forty-nine states (all

states except Texas) and the District of Columbia. The Court will hereinafter refer to the states and the District of Columbia collectively as the "states" and to the sub-classes as the "state sub-classes."

The SAC includes 114 counts. Plaintiffs assert federal and state law claims that generally fall into seven categories. On behalf of themselves and the nationwide class, Plaintiffs assert: (1) one claim of violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.*; (2) one claim of fraudulent concealment (common law); and (3) one claim of breach of contract (common law). On behalf of themselves and the state sub-classes, Plaintiffs assert: (4) fifty-two claims of violation of consumer protection law (two for CA and the rest for individual states); (5) one claim of false advertising (NY); (6) fourteen claims of unjust enrichment (individual states); and (7) forty-four claims of breach of the implied warranty of merchantability (two for CA and the rest for individual states).

In lieu of answering the SAC, Ford filed the current motion to dismiss all the claims pursuant to Fed. R. Civ. P. 12(b)(6). Ford moves to dismiss the SAC on multiple grounds and implicating the laws of multiple states. Among other grounds, Ford moves to dismiss: (1) all the claims for failing to plausibly allege a defect; (2) some of the claims for lack of standing; (3) some of the implied warranty claims for, among other things, failing to plausibly allege unmerchantability, breach within the warranty period, and adequate notice of breach, as well as lack of privity; (4) the

3

MMWA claim for, among other things, lacking one hundred named plaintiffs; and (5) the consumer protection and unjust enrichment claims for, among other things, failing to allege fraud with particularity, and failing to adequately plead knowledge and a duty to disclose.

For clarity purposes, the Court will identify the claims by name and the Plaintiffs by state (e.g., "implied warranty claim(s)" and "Droesser (KS)") rather than by the count designated in the SAC. A summary of the dismissed counts appears at the conclusion of this opinion and order.

## II.     PLEADING STANDARDS

The federal rules require a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that does not meet this threshold may be dismissed for failing to state a claim for relief. Fed. R. Civ. P. 12(b)(6).

When deciding a motion to dismiss under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all of the factual allegations contained in the complaint as true. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). In order to survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

4

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation omitted). "Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Beyond the complaint, a court may consider "any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss" if the documents are "referred to" in the complaint and "central to" its claims. *Bassett v. Nat'l Collegiate Athletics Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "When a document contradicts allegations in the complaint, rendering them implausible, the exhibit trumps the allegations." *Nolan v. Detroit Edison Co.*, 991 F.3d 697, 707 (6th Cir. 2021) (quotation omitted). "If, on the other hand, the document provides support for both parties' version of events," a court must "view the facts in the light most favorable to the plaintiff." *Id.* at 707-08.

### III.  FACTUAL BACKGROUND

This case centers on (1) diesel trucks, whose diesel engines provide benefits over gasoline engines, (2) the CP4 pump, part of the fuel injection system for the diesel engine in the class vehicles, and (3) diesel fuel, which fuel pumps use for

lubrication. The Court accepts the following factual allegations set forth by Plaintiffs in the SAC as true. *Lambert*, 517 F.3d at 439.

When purchasing trucks, some customers are willing to pay a premium for diesel versions because diesel engines are more reliable, fuel efficient, and powerful than gasoline engines. (ECF No. 44, PageID.14264-14265, ¶¶ 89-91). One way that the automotive industry has achieved these benefits from diesel engines involves the injection of diesel fuel into the cylinders. (*Id.*, PageID.14266, ¶ 93). Modern fuel injection systems use high-pressure components to improve atomization inside the combustion chambers and complex electronics to precisely control injection and combustion events. (*Id.*, PageID.14266-14270, ¶¶ 92, 94, 96-97). The high-pressure components include a centralized fuel pump, individual injectors for the combustion chambers, and a common rail for supplying a consistent source of pressurized diesel fuel from the fuel pump to the injectors. (*Id.*, PageID.14266-14267, ¶¶ 94-95). When adopting the lower-volume, higher-pressure CP4 pump for the class vehicles, Ford promised customers that the diesel engine would offer increased fuel efficiency and power while maintaining reliability. (*Id.*, PageID.14211-14212, 14270-14271, 14319-14320, ¶¶ 9, 99, 173).

A schematic of the CP4 pump is shown in Figure 4 of the SAC, which is reproduced in part below. The CP4 pump includes an engine-driven camshaft and pumping cylinders with camshaft-driven plungers. It uses a cam to convert rotation

of the camshaft into up and down movement of the plungers. When connected to the diesel engine, the diesel engine rotates the camshaft, the camshaft rotates the cam, and the cam lifts the plungers for pressurizing strokes. Plaintiffs focus on the cam, and for each pumping cylinder, the mechanism between the cam and the plunger. The CP4 pump includes a two-lobe cam, a roller parallel to the camshaft, and a tappet with a roller shoe in the pumping cylinder. As the cam rotates, the roller rotates between the camshaft and the tappet by rolling along the cam and rotating inside the roller shoe. (*Id.*, PageID.14271-14284, ¶¶ 100-124).



Plaintiffs allege that, with its cam-roller-tappet mechanism, the CP4 pump has a fragile and unstable design that contaminates the fuel injection system with metal shavings. (*Id.*, PageID.14207-14208, ¶¶ 1-2). The CP4 pump wears whenever the roller stops rotating. (*Id.*, PageID.14275, ¶ 106). When the roller stops rotating, metal shavings wear off as the roller slides across the cam instead of rolling along the cam. (*Id.*). The CP4 pump features a small rolling contact area between the roller

7

and the cam, and wear is exacerbated by the high contact stresses between the cylinder-shaped parts. (*Id.*, PageID.14275-14276, ¶¶ 107-108). Add to these issues that the tappet is not prevented from rotating inside the pumping cylinder. (ECF No. 44, PageID.14277-14278, ¶ 110). When this happens, the tappet moves the roller from parallel to the camshaft to perpendicular to the camshaft, and metal shavings wear off as the roller carves a trough into the cam. (*Id.*). Another issue is that when the roller stops rotating, metal shavings wear off as the roller sticks inside the roller shoe instead of rotating inside the roller shoe. (*Id.*, PageID.14278-14279, ¶¶ 111-112). What is more, because the fuel pumps use diesel fuel for lubrication, and because of its fragile and unstable design, the CP4 pump is incompatible with U.S. diesel fuel. (*Id.*, PageID.14208, 14279, ¶¶ 2, 113).

Plaintiffs allege that it is well-known in the U.S. automotive industry that the lubricity of diesel fuel is important to the durability of fuel pumps. (*Id.*, PageID.14286, ¶ 127). Compared to European diesel fuel, U.S. diesel fuel is "cleaner" but "dry" and less "lubricious." (*Id.*, PageID.14208, 14211, ¶¶ 2, 8). In the U.S., diesel fuel is regulated by the Environmental Protection Agency (EPA), whose cleaner emissions standards require the reduction of sulfur content during the refining process. (*Id.*, PageID.14285-14286, ¶ 126). In the 1990s, an estimated sixty-five million fuel pumps failed when the EPA first implemented cleaner emissions standards and low-sulfur diesel fuel first hit the market. (*Id.*, PageID.14211, 14286,

¶¶ 8, 127). In connection with the current ultra-low-sulfur diesel (ULSD) fuel, the EPA has adopted a separate standard for minimum lubricity. (*Id.*, PageID.14286-14287, ¶ 128). For diesel fuel, lubricity is quantified in "wear scar," a shorthand way of referring to the diameter of scratches that a sample allows during testing. *Id.* The smaller or larger the wear scar, the higher or lower the lubricity. *Id.* To meet the European standard, diesel fuel must have a minimum lubricity of 460 wear scar, but to meet the U.S. standard, diesel fuel need only have a minimum lubricity of 520 wear scar. (*Id.*, PageID.14287, ¶ 129).

Plaintiffs allege that by the time Ford introduced the class vehicles, it was well-known in the U.S. automotive industry that catastrophic failures were widespread in diesel vehicles equipped with the CP4 pump. (*Id.*, PageID.14305-14310, ¶¶ 152-153). In February 2011, the National Highway Traffic Safety Administration (NHTSA) opened an investigation into 2009-2010 Volkswagen and Audi diesel vehicles equipped with the CP4 pump. (*Id.*, PageID.14304-14305, ¶ 151). The NHTSA opened its investigation after receiving 160 complaints of engine stall and loss of power incidents related to high-pressure fuel pump (HPFP) failures. *Id.* The NHTSA requested information from not only Volkswagen, the parent automaker, and Bosch, the supplier of the CP4 pump, but also Ford and other automakers. *Id.* Submissions from the companies were later published on the NHTSA website. *Id.* The parties discuss the documents from the NHTSA

9

investigation in various contexts. The Court will address these documents as they relate to the parties' arguments.

## IV.     DEFECT

In moving to dismiss the SAC, Ford maintains that certain documents incorporated into the SAC contradict Plaintiffs' allegations and render them implausible. Urging the Court to consider the documents, Ford argues that dismissal is appropriate because they disprove that the CP4 pump is incompatible with U.S. diesel fuel. Plaintiffs argue that dismissal is not appropriate because they have plausibly alleged a defect, the documents do not contradict their allegations, and Ford raises evidentiary disputes whose resolution is improper on a Rule 12(b)(6) motion.

Ford focuses its argument on the documents related to (1) U.S. diesel fuel lubricity, (2) the CP4 pump's design and testing, and (3) the durability of the CP4 pump. As to the lubricity of U.S. diesel fuel, Ford points to quality data from 2007-2009, 2014, and 2018. (*Id.*, PageID.14292-14295, ¶¶ 136-141; ECF No. 45 *SEALED*, PageID.17663-17664). As to the design and testing of the CP4 pump, Ford points to Bosch's technical specifications for the model it supplies to Ford. (ECF No. 44, PageID.14394-14395, ¶ 278). Ford has submitted the documents under seal and represents that Plaintiffs obtained them through discovery in a related matter before filing the SAC. (ECF No. 50 *SEALED*). As to the durability of the CP4

pump, Ford points to documents from the NHTSA investigation. (ECF No. 44, PageID.14304-14310, 14314-14315, 14322, ¶¶ 151-153, 162-163, 176).

Ford does not dispute that according to the 2007-2009 quality data, U.S. diesel fuel largely fell outside the U.S. standard of 520 wear scar. (ECF No. 45 *SEALED*, PageID.17663-17664, ¶ 141). Ford maintains, however, that U.S. diesel fuel is currently more lubricous than in the past. According to the 2014 and 2018 quality data, U.S. diesel fuel is well within the U.S. standard and largely within even the European standard. For example, in 2014/2018, samples from the East Coast, Midwest, and West Coast regions had mean wear scars of 325/385, 378/390, and 456/448. (ECF No. 49, PageID.18201; ECF No. 44, PageID.14294, ¶ 138).

Contrary to Plaintiffs' allegations that it was designed for compatibility with diesel fuel up to the European standard, Ford maintains that the CP4 pump was designed for compatibility with diesel fuel up to U.S. standards. More specifically, while Plaintiffs allege that it allows wear scars up to 460, the technical specifications state that the CP4 pump allows wear scars up to 520. (ECF No. 44, PageID.14394-14395, ¶ 278; ECF No. 49, PageID.18204). Similarly, Ford maintains that, contrary to Plaintiffs' allegations that Ford skewed results by using unrealistic test fuel, the CP4 pump was tested using test fuel well outside the U.S. standard. While Plaintiffs allege that Ford used test fuel with wear scars between 400 and 520, the technical

specifications list endurance tests using test fuel rated at 570 and 650 wear scar. (ECF No. 44, PageID.14211, 14316-14317, ¶¶ 8, 167; ECF No. 49, PageID.18204).

As set forth in Ford's January 2012 response, the NHTSA requested "peer vehicle" information from Ford, including information on sales of service replacements and analysis of field returns. (ECF No. 44-11, PageID.15117, 15130-15131, 15133). For service replacements, Ford submitted a document with 2007-2011 sales, a timeframe covering a previous fuel pump used in 2008-2010 pre-class vehicles, and the CP4 pump used in 2011-2012 class vehicles. (ECF No. 53-2). Ford maintains that, contrary to Plaintiffs' allegation of an uptick in failures, the 2011 sales show a dramatic decrease in service replacements after adopting the CP4 pump in the class vehicles. (ECF No. 44, PageID.14394; ECF No. 53-2, PageID.18663). Ford submitted a document with the analysis for over a hundred CP4 pumps removed from 2011 class vehicles. (ECF No. 44-22). Ford maintains that, contrary to Plaintiffs' allegation that the CP4 pumps failed and that the failures implicate the alleged defect, many CP4 pumps did not fail and only twelve failures implicate the alleged defect. (ECF No. 44, PageID.14315, ¶ 163; ECF No. 44-22, PageID.15404-15426).

Before turning to the documents, the Court agrees with Plaintiffs that Ford does not address all the relevant allegations. While the SAC is not short on allegations of incompatibility with U.S. diesel fuel, Ford's argument assumes that

the sole defect is the CP4 pumps' incompatibility with the lubricity of U.S. diesel fuel. But Plaintiffs more generally allege that the CP4 pump has a fragile and unstable design, and is therefore particularly incompatible with U.S. diesel fuel. As Plaintiffs point out, Ford does not address a section of the SAC on fuel pump design, where Plaintiffs explain (1) why the CP4 pump wears and generates metal shavings regardless of the quality of diesel fuel, and (2) why the pump is incompatible with foreseeable contamination by water and corrosive particles. (ECF No. 44, PageID.14271-14284, ¶¶ 100-124). Accepting Plaintiffs' allegations as true, the SAC plausibly alleges a defect.

The documents appended to Ford's response do not alter this conclusion. To begin with, the Sixth Circuit has cautioned that while an exhibit controls when it contradicts allegations in the complaint, "it is not always appropriate to assume everything in an exhibit is true." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 441-42 (6th Cir. 2012) (quotation and alteration omitted). Since they are not legally dispositive documents between the parties, Ford may cite the documents to "prove their existence" but not to "prove the truth of the matters asserted within them." *Id.* at 442. These principles are particularly relevant to the technical specifications. Many Plaintiffs allege experiencing catastrophic failures that are plausibly implicated by the alleged defect. Giving the technical specifications the controlling weight Ford urges would deprive Plaintiffs of the presumption of truth to which they

are entitled at this stage of the litigation. *Carrier*, 673 F.3d at 442. The wear scar numbers that Ford and Bosch put on paper cannot disprove the alleged defect as a matter of law.

Second, as Plaintiffs suggest, Ford raises evidentiary disputes whose resolution is improper on a Rule 12(b)(6) motion. As to the field returns for each CP4 pump, these documents include a number of analysis columns culminating in the identified root cause. (ECF No. 44-22, PageID.15404-15426). In the written briefs, the parties agree that twelve failures implicate the alleged defect, but dispute how to interpret the analysis to determine how many additional failures exist and whether any of those failures implicate the alleged defect.

Ford focuses on the root cause and only accounts for instances of poor lubricity fuel. Plaintiffs scrutinize the analysis to account for additional instances of fuel contamination, metal, debris, corrosion, and the like. But the Court is in no position to resolve the evidentiary dispute, let alone in Ford's favor at this stage of the case.

Third, the quality data can cut both ways, and at this stage of the case, the Court must construe the SAC in the light most favorable to Plaintiffs. *Nolan*, 991 F.3d at 707-08. Ford might very well have a point that U.S. diesel fuel is more lubricous now than in the past. But to the extent U.S. diesel fuel largely fell outside the U.S. standard at the time, the quality data undercuts the technical specifications

14

and supports Plaintiffs' allegation that Ford disregarded the lubricity problem. And insofar as U.S. diesel fuel is well within the U.S. standards, the quality data lends weight to the field returns and supports Plaintiffs' allegations that the CP4 pump has a fragile and unstable design.

Since Plaintiffs plausibly allege a defect, and the documents appended to Ford's response do not change this outcome, the Court will **DENY** Ford's motion to dismiss all the claims for failing to plausibly allege a defect.

## V.    STANDING

Ford moves to dismiss some of the claims for lack of standing. The doctrine of constitutional standing serves to identify which disputes satisfy Article III's case-or-controversy requirement and implicates federal subject-matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing requires the plaintiff to show (1) an injury in fact that (2) was caused by the defendant's conduct and (3) is likely be redressed by a favorable decision. *Id.* at 560-61.

As a preliminary matter, apart from certain state law claims and certain Plaintiffs (which are discussed below) Ford does not question whether Plaintiffs have standing with respect to Ford. Instead, Ford moves to dismiss all the state law claims except for those states where Plaintiffs reside or purchased class vehicles. And second, Ford moves to dismiss all the claims where the plaintiffs did not experience catastrophic failures that resulted in actionable injury.

## A.    Representation

The eighteen named Plaintiffs purchased class vehicles in twelve states and seek to represent a nationwide class of all purchasers and lessees. On behalf of themselves and the state sub-classes, Plaintiffs assert consumer protection, false advertising, unjust enrichment, and implied warranty claims under the laws of fifty individual jurisdictions. In the written briefs, the parties appear to assume that on behalf of themselves, Plaintiffs assert state law claims under the laws of their own states, that is, the states where they reside or purchased class vehicles. Ford argues that because they only allege injuries in their own states, dismissal is appropriate as to the rest of the state law claims because Plaintiffs lack standing to assert state law claims under the laws of other states. Plaintiffs argue that dismissal is not appropriate because their ability to assert state law claims on behalf of out-of-state class members is not a matter of standing under Article III. Plaintiffs add that any analysis pertaining to the state law claims at issue is only ripe at the class certification stage and must be governed by whether Plaintiffs can meet the requirements of Fed. R. Civ. P. 23.

Each party has presented the Court with ample authority illustrating that district courts are split on standing and representation issues when class action plaintiffs assert state law claims under the laws of states other than their own. Two

of the earlier decisions from the Eastern District of Michigan, *Packaged Ice*, cited by Ford, and *Hoving*, cited by Plaintiffs, are representative. In both decisions, the district court presumed that an individual standing requirement exists with respect to the state law claims for out-of-state class members. In *Packaged Ice*, the Court dismissed the state law claims at issue for lack of standing because the plaintiffs did not plausibly allege injuries in other states. *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657-58 (E.D. Mich. 2011) (Borman, J.). In *Hoving*, the Court postponed resolving the standing and representation issues until the class certification stage. *Hoving v. Transnation Title Ins. Co.*, 545 F. Supp. 2d 662, 667-68 (E.D. Mich. 2008) (Lawson, J.). "For example," the Court explained, "the plaintiff certainly could not file an individual suit only seeking relief under Arizona law; however, a member of his proposed class from that state likely would have suffered an injury that could be redressed under Arizona law." *Id.* at 668. Observing that the plaintiff's standing with respect to the defendant and the laws of his own state was not challenged, the Court found that the plaintiff's standing to represent out-of-state class members would be subsumed in the class certification decision. *Id.* at 667-68.

While district courts are split, a consensus has emerged among the courts of appeal. All five circuits to have addressed the question hold that a plaintiff's ability to assert state law claims on behalf of out-of-state class members is a matter of

representation under Rule 23, not a question of Article III standing. *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011); *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93 (2d Cir. 2018) ("as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), not a question of adjudicatory competence under Article III") (quotations and citations omitted); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018); *Mayor of Baltimore v. Actelion Pharm. Ltd.*, 995 F.3d 123, 134 (4th Cir. 2021); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 21-10335, 2022 U.S. App. LEXIS 30823, at *16 (11th Cir. Nov. 7, 2022) ("whether a plaintiff can represent unnamed class members whose claims fall under different states' laws … is a question that concerns Rule 12(b)(6) or Rule 23—not Article III").

In *Hoving*, the district court reached the same result by applying the teachings from the closest binding authority, the Sixth Circuit's *Fallick* decision. *Hoving*, 545 F. Supp. 2d at 667-68 (citing *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422-23 (6th Cir. 1998)). In *Fallick*, the Sixth Circuit addressed standing and representation issues in the context of benefit plans governed under the Employment Retirement Income Security Act (ERISA). *Fallick*, 162 F.3d at 411. The plaintiff challenged the reimbursement methodology used by the defendant's benefit plans.

18

*Id.* at 411-12. The plaintiff was a member of one benefit plan and sought to represent members of other benefit plans. *Id.* at 412. The district court dismissed the claims against the other benefit plans, holding that the plaintiff lacked standing to represent members of benefit plans other than his own. *Id.* Finding that the district court's analysis "confuses the requirements of Article III and Rule 23," the Sixth Circuit reversed and remanded with instructions to proceed with the class certification stage. *Id.* at 421, 424. According to the Sixth Circuit, "[o]nce his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure." *Id.* at 423.

Ford attempts to place some distance between this litigation and *Fallick*, arguing that the Sixth Circuit's decision is limited to ERISA claims. But the Court finds that *Fallick* more generally dispenses with the requirement that plaintiffs in a class action possess individual standing to assert the claims of class members. There, the Sixth Circuit did not question whether the plaintiff lacked individual standing to assert claims against other benefit plans. In fact, the Sixth Circuit confirmed that the district court's analysis was correct but for the difference between an individual action and a class action. *Id.* at 422 n.9 (explaining that the Ninth Circuit properly affirmed dismissal for lack of standing where plaintiff asserted claims against multiple pension plans in an *individual* action).

In light of *Fallick*, the Court concludes that the Sixth Circuit would side with its sister circuits and hold that a plaintiff's ability to assert state law claims on behalf of out-of-state class members is a matter of representation under Rule 23. "Since class action plaintiffs are not required to have individual standing to press any of the claims belonging to their unnamed class members, it makes little sense to dismiss the state law claims of unnamed class members for want of standing when there was no requirement that the named plaintiffs have individual standing to bring those claims in the first place." *Langan*, 897 F.3d at 95.

Accordingly, the Court will **DENY** Ford's motion to dismiss all the state law claims from states other than the twelve where Plaintiffs reside or purchased class vehicles.

### B.    Injury

Ford moves to dismiss the following claims for failing to plausibly allege an actionable injury: Droesser (KS), Fowlkes (MI), Saddler (OH), Mertz (CA), Sawicki (CA), and Doa (MI). Ford focuses on these Plaintiffs because they do not allege catastrophic failures, and as a result, do not plausibly allege the requisite defect manifestation that led to an actionable injury.

Plaintiffs respond that dismissal is not appropriate because they plausibly allege injury in the form of overpayment and defect manifestation in the form of progressive failures.

Plaintiffs frame their argument in terms of "injury in fact" under Article III, while Ford frames its argument more broadly in terms of "injury" under the respective state laws. The parties thus raise two standing issues. The first issue is whether Plaintiffs plausibly allege Article III injury in fact. The second issue is whether Plaintiffs plausibly allege actionable injury under the respective state laws.

### 1.    Article III

Under Article III, "certain harms readily qualify as concrete injuries," the "most obvious" being "traditional tangible harms, such as physical harms and monetary harms." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,  2204 (2021). "If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id.* In accordance with these principles, "the Sixth Circuit and other courts in this district have countenanced the overpayment theory of injury." *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 694 (E.D. Mich. 2020). "The prevailing jurisprudence in this district … holds that a consumer who alleges she would not have purchased a vehicle (or would have paid less for it) had the manufacturer not misrepresented the vehicle to customers' detriment or omitted mention of its significant limitations, has alleged a plausible injury-in-fact." *Id.* at 694. "Put another way, once a consumer sufficiently and plausibly pleads the existence of a product defect, the financial injury stemming from the defect is easily established: defective cars and trucks are simply not worth

21

as much." *Id.* at 694-95 (quotations and alteration omitted); *see also In re Evenflo Co.*, 54 F.4th 28, 35-39 (1st Cir. 2022) (recognizing overpayment as a cognizable form of injury and collecting cases from other circuits).

Plaintiffs contend that had Ford disclosed the alleged defect, they would not have purchased class vehicles or would have paid significantly less for them. Therefore while those who allege experiencing catastrophic failures additionally point to repair costs, all Plaintiffs allege that Ford has caused them out-of-pocket losses in the form of overpayment at the point of sale. This is a plausible injury-in-fact under Article III.

### 2. State Law

As to the respective state laws, Ford maintains that Kansas, Michigan, Ohio, and California require actual loss. To establish actual loss, Ford suggests that Plaintiffs must sell their class vehicles at a reduced price. But Ford does not provide any binding or authoritative cases where a Kansas, Michigan, Ohio, or California court explicitly rejected overpayment as an actionable form of injury.

And the cases Ford references involve alleged defects that may or may not manifest in products that are currently performing satisfactorily. *See*, *e.g.*, *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) ("The Plaintiffs' ABS brakes have functioned satisfactorily and at no time have the brakes exhibited a defect."); *In re Toyota*, 915 F. Supp. 2d at 1159 ("After the updated software was installed in

his vehicle, [plaintiff] had no problem with the braking performance of his vehicle. He had no accident. He was able to apply the brakes and stop his vehicle without incident."); *Miller v. Gen. Motors, LLC*, 2018 U.S. Dist. LEXIS 95550, at *30 (E.D. Mich. June 7, 2018) ("In contrast to [other plaintiffs], however, [plaintiff] does not allege that her liftgate failed, hindered her ability to use the rear compartment, or otherwise malfunctioned in any way.").

Ford's position assumes that catastrophic failures are the only relevant manifestation of the alleged defect. But the SAC alleges that the CP4 pump has a fragile and unstable design that begins contaminating the fuel injection system with metal shavings once the diesel engine begins operating initially. (ECF No. 44, PageID.14207-14209, ¶¶ 1-2, 4). While eventually causing catastrophic failures, the alleged defect is inherent in the design of the CP4 pump and inevitably causes progressive failures that damage the CP4 pump, the fuel injection system, and the diesel engine. (*Id.*, PageID.14208-14210, ¶¶ 3, 5-6).

Corroborating this theory of recovery, Plaintiffs offer supporting allegations from non-party sources. For instance, in the SAC's fuel pump design discussion, Plaintiffs rely upon academic and industry articles to explain why the CP4 pump wears and generates metal shavings. (*Id.*, PageID.14281-14284, ¶¶ 119-123). And Plaintiffs reference non-party online materials showing how the CP4 pump defects

are so prevalent that an aftermarket has developed for products that mitigate the consequent damage. (*Id.*, PageID.14340-14342, ¶¶ 196-199).

Accepting Plaintiffs' allegations as true, the Court finds that Plaintiffs who do not allege experiencing catastrophic failures plausibly allege defect manifestation in the form of progressive failures. Even applying the non-manifestation line of authority, Plaintiffs plausibly allege actionable injuries in the form of an inherent defect. *See, e.g., In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616-17 (8th Cir. 2011) (recognizing distinction for plumbing system fittings whose alleged inherent defect manifests upon exposure to water and will eventually cause leaks).

For all these reasons, the Court will **DENY** Ford's motion to dismiss the claims of those specific Plaintiffs who do not allege experiencing catastrophic failures.

## VI. WARRANTY-BASED CLAIMS

Ford moves to dismiss the "warranty-based" claims, referring to the MMWA claim under federal law and the predicate implied warranty claims under the laws of the states where Plaintiffs purchased the class vehicles. With some exceptions that will be addressed separately, the relevant states have adopted Article 2 of the Uniform Commercial Code ("UCC"). The UCC provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." U.C.C. § 2-314(1). "Goods to be

merchantable must be at least … fit for the ordinary purposes for which such goods are used." *Id.* § 2-314(2)(c).

## A.   Merchantability

Ford moves to dismiss the following implied warranty claims for failure to plausibly allege unmerchantability: Droesser (KS), Fowlkes (MI), Saddler (OH), Mertz (CA), Sawicki (CA), and Doa (MI). Ford once again focuses on these Plaintiffs because they do not allege experiencing catastrophic failures. Ford argues that dismissal is appropriate because in the absence of catastrophic failures, Plaintiffs do not plausibly allege that their class vehicles are unfit for providing transportation. Plaintiffs respond that dismissal is not appropriate because they plausibly allege that their class vehicles are unfit for providing safe and reliable transportation.

The Court agrees with Plaintiffs. In *Matanky*, the district court held that "cars are not merchantable merely because they are able to provide transportation. Rather, to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects." *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 785 (E.D. Mich. 2019) (citing *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 945-46 (N.D. Cal. 2018) (holding that safety, reliability, operability, and substantial freedom from defects are independent grounds for demonstrating unmerchantability).

Similarly, in *Hodges*, the Kansas Supreme Court explained that because merchantable goods are those "fit for the ordinary *purposes* for which such goods are used," an interpretation that a vehicle must be "fit for the *primary* purpose of transportation" is "inconsistent with the plain language" of U.C.C. § 2-314(2)(c). *Hodges v. Johnson*, 199 P.3d 1251, 1260 (Kan. 2009) (emphasis in original). "Although there can be little doubt that the *primary* purpose of a vehicle is transportation," this interpretation "ignores the reality that a buyer may purchase a particular vehicle for a number of other purposes—among which may be safety, fuel economy, [or] utility." *Id.* (emphasis in original).

This case bears out these principles. The extent of a merchant's obligation under the implied warranty of merchantability is a question of fact that depends on the circumstances of the transaction. *Id.* Plaintiffs allege that when purchasing trucks, some customers are willing to pay a premium for diesel versions because diesel engines are more reliable, fuel efficient, and powerful than gasoline engines. (ECF No. 44, PageID.14264-14265, ¶¶ 89-91).

The class vehicles, however, contain diesel engines with CP4 pumps that are fragile, unstable, and contaminate the fuel injection system with metal shavings. (*Id.*, PageID.14207-14208, 14266-14270, ¶¶ 1-2, 92, 94, 96-97). The defects cause progressive failures that damage the CP4 pump, the fuel injection system, and the diesel engine, and can cause catastrophic failures that make the class vehicles shut

off in motion without the ability to restart. (*Id.*, PageID.14208-14209, ¶¶ 2-5). And beyond posing a continuing safety risk, the repair costs for catastrophic failures are at least $10,000. (*Id.*, PageID.14208-14209, ¶¶ 3-4).

Accepting Plaintiffs' allegations as true, the Court finds the SAC plausibly alleges that the ordinary purpose of the class vehicles is providing safe and reliable transportation. The Court also finds that even those Plaintiffs who did not experience catastrophic failures still plausibly allege that their class vehicles are unfit for their ordinary purpose and are not substantially free of defects. Accordingly, the Court will **DENY** Ford's motion to dismiss the above implied warranty claims.

### B.     Breach

Ford next turns to Plaintiffs who allege experiencing catastrophic failures. The parties explain that the class vehicles come with Ford's five-year/100,000-mile New Vehicle Limited Warranty ("NVLW"). Ford maintains that the NVLW limits the duration of implied warranties to the warranty period. Assuming the duration limitation is valid and enforceable, Ford moves to dismiss the following the implied warranty claims for failing to plausibly allege breach within the warranty period: Reeves (AL), Bauers (IN), Angona (LA), Markovich (IL), Stidham (NC), and Eriv

(NJ).[1] Plaintiffs argue that dismissal is not appropriate because they plausibly allege breach at the point of sale.

The Court agrees with Plaintiffs. Ford's position assumes that the class vehicles are fit for providing transportation in the absence of catastrophic failures, and therefore that the implied warranty of merchantability is only breached upon the occurrence of catastrophic failures. For implied warranties, the UCC provides that "[a] breach of warranty occurs when tender of delivery is made." U.C.C. § 2-725(2). As Ford itself insists elsewhere in the written briefs, Plaintiffs' implied warranty claims "accrue at the time of *original* tender, when Ford impliedly warranted *that* vehicle's fitness." (ECF No. 49, PageID.18214-18215).

As set forth above, the Court has found that in connection with the CP4 pump, Plaintiffs plausibly allege that their class vehicles are unfit for their ordinary purpose and are not substantially free of defects. As a result, the SAC plausibly alleges that Ford breached the implied warranty of merchantability at the point of sale.

---

[1] Ford also moves to dismiss the following implied warranty claims: Ford (LA), Parker (OH), Wentz (PA), and Tremblay (FL). However, in the SAC, Plaintiffs allege that when Ford, Parker, Wentz, and Tremblay experienced catastrophic failures, their class vehicles were "still under a Ford-backed 5-year/100,000-mile manufacturing warranty." (ECF No. 44, PageID.14217, 14222, 14225, 14232-14233, ¶¶ 18, 25, 29, 40). Because the SAC refutes Ford's stated basis for dismissal, the Court will **DENY** Ford's motion to dismiss as to these Plaintiffs and address its discussion to the remaining Plaintiffs.

Accordingly, the Court will **DENY** Ford's motion to dismiss the above Plaintiffs' implied warranty claims.

### C.    California Song-Beverly

On behalf of Plaintiffs Mertz (CA) and Sawicki (CA), the SAC asserts a breach of the implied warranty of merchantability under the Song-Beverly Act. Ford moves to dismiss this claim for two reasons – one directed to Plaintiff Sawicki and one directed to both Plaintiffs.

As to Plaintiff Sawicki, the Song-Beverly Act applies to "consumer goods," defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes." CAL. CIV. CODE §§ 1791(a). The SAC alleges that Sawicki purchased a "new" 2017 class vehicle and "uses [it] as his daily vehicle for daily activities, vacation with family to pull his RV to various campgrounds, and for use at his RV Company to move RVs from one location to another." (ECF No. 44, PageID.14240, ¶ 50). Ford argues that dismissal is appropriate because Sawicki uses his class vehicle for business purposes. Plaintiffs respond that dismissal is not appropriate because the question is whether Sawicki uses his class vehicle primarily for personal purposes, and this determination is improper on a Rule 12(b)(6) motion.

The Court agrees with Plaintiffs. While additionally pointing to business activities, Plaintiffs mainly assert that Sawicki uses his class vehicle for daily

29

activities and vacations. The SAC therefore plausibly alleges that Sawicki uses his class vehicle primarily for personal purposes. Accordingly, the Court will **DENY** Ford's motion to dismiss the Song-Beverly Act implied warranty claims as to Plaintiff Sawicki (CA).

As for both Plaintiffs, the Song-Beverly Act has a one-year durational limitation on the implied warranty of merchantability. CAL. CIV. CODE §§ 1791.1(c). Since these Plaintiffs do not allege experiencing catastrophic failures, Ford argues that dismissal is appropriate because their class vehicles were merchantable for one year. Plaintiffs responds that dismissal is not appropriate because they plausibly allege breach at the point of sale.

The Court agrees with Plaintiffs. In *Mexia*, the California Court of Appeal court held that "[t]here is nothing that suggests a requirement that the purchaser discover and report to the seller a latent defect" within the durational limitation. *Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1310 (2009). "In the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." *Id.* at 1305. In *Daniel*, the United States Ninth Circuit Court of Appeals analyzed California law and concluded that *Mexia* must be followed because there was no evidence that the California Supreme Court would decide the issue differently. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1222-23 (9th Cir. 2015).

30

Because the SAC plausibly alleges breach of the implied warranty of merchantability at the point of sale, the Court will **DENY** Ford's motion to dismiss the Song-Beverly Act implied warranty claims as to Plaintiffs Mertz (CA) and Sawicki (CA).

### D.    Notice

Ford moves to dismiss the following  implied warranty claims for failure to allege adequate notice of breach: Droesser (KS), Fowlkes (MI), Saddler (OH), Mertz (CA), Sawicki (CA), Reeves (AL), Bauers (IN), Stidham (NC), and Doa (MI).[2]

The UCC provides that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." U.C.C. § 2-607(3)(a). Ford argues that dismissal is appropriate because these Plaintiffs do not allege notifying Ford of the breach prior

---

[2] Ford also moves to dismiss the following implied warranty claims: Ford (LA), Parker (OH), Wentz (PA), Meehan (OH), Tremblay (FL), Ponteaux (FL), Angona (LA), Markovich (IL), and Eriv (NJ). The SAC alleges that Parker, Wentz, Meehan, Tremblay, and Ponteaux experienced catastrophic failures within the warranty period and went to Ford dealerships for repairs, (ECF No. 44, PageID.14222, 14225, 14228, 14232-14233, 14235-14236, ¶¶ 25, 29, 33, 40, 44), that Ford (LA) and Eriv experienced catastrophic failures within the warranty period and that Ford refused to cover the repairs, (*Id.*, PageID.14217, 14259, ¶¶ 18, 78-79), and that Angona and Markovich experienced catastrophic failures and went to Ford dealerships for repairs, (*Id.*, PageID.14248-14249, 14251-14252, ¶¶ 62-63, 67). Plaintiffs say these allegations plausibly show they satisfied the notice requirement. Since Ford does not address this argument, the Court will **DENY** Ford's motion to dismiss as to these Plaintiffs and direct its analysis to the remaining Plaintiffs.

to filing their lawsuit. Although Plaintiffs do not contest this point as to these individual Plaintiffs, they respond that dismissal is not warranted because they sent Ford notice letters, plaintiffs from other lawsuits notified Ford about the breach, and Ford knew about the alleged defects. Plaintiffs further argue that some states do not require notice by third-party beneficiaries, to remote manufacturers, or prior to filing a complaint altogether, and that sufficiency-of-notice determinations are fact-based inquiries that a Rule 12(b)(6) motion cannot resolve.

The SAC does not allege that the above Plaintiffs notified Ford about the breach prior to instituting this action. Nor do they allege facts supporting a reasonable inference that they notified Ford about the breach prior to filing this case. While the SAC includes allegations of notice, the allegations are general to all Plaintiffs and all class members. For example, in the nationwide class allegations, the SAC asserts that "Ford was provided notice," among other ways, "by numerous individual letters or communications by Plaintiffs or Sub-Class Members to Ford, including Ford dealerships, either orally or in writing, Plaintiffs' counsel, on behalf of Plaintiffs, to Ford either orally or in writing." (ECF No. 44, PageID.14393, ¶ 271). While Plaintiffs allege that August 2019 and November 2019 letters exist for some state sub-classes, the allegations are again general to all Plaintiffs and all class members. (*Id.*, PageID.14407-14408, ¶ 318). These letters do not appear in the record and their description in the SAC does not support a reasonable inference that

these individual Plaintiffs ever notified Ford about its breaching the implied warranty of merchantability.

Because the UCC uses a reasonableness standard, notice issues must be analyzed on a state-by-state basis.

### 1. Ohio

As an initial matter, for Ohio, Plaintiffs assert a claim of breach of implied warranty *in tort*. (*Id.*, PageID.14668-14669, ¶¶ 1352-1357). Since the UCC is Ford's stated basis for dismissal, the Court will **DENY** Ford's motion to dismiss the implied warranty claims as to Plaintiff Saddler (OH).

### 2. California

California has a carveout for manufacturers with whom the buyer has not transacted. *In re Toyota Motor Corp.*, 754 F. Supp. 2d 1145, 1180 (C.D. Cal. 2010) (notice requirement excused as to a manufacturer with which the purchaser did not deal) (citing *Greenman v. Yuba Power Prods., Inc.*, 59 Cal. 2d 57, 61 (1963)). Accordingly, the Court will **DENY** Ford's motion to dismiss the implied warranty claims as to Plaintiffs Mertz (CA) and Sawicki (CA).

### 3. Kansas, Indiana, and North Carolina

Sufficiency of notice under Kansas, Indiana, and North Carolina law are fact-bound determinations and therefore ill-suited for disposition on a Rule 12(b)(6) motion. *Golden v. Den-Mat Corp.*, 276 P.3d 773, 788 (Kan. Ct. App. 2012)

(timeliness of consumer's notice is a jury question when merchant does not claim prejudice); *Agrarian Grain Co., Inc. v. Meeker*, 526 N.E.2d 1189, 1193 (Ind. Ct. App. 1988) (notice may be satisfied by buyer's actual knowledge); *S.S. Kresge Co. v. G.T.E. Sylvania, Inc.*, 273 S.E.2d 681, 685 (N.C. 1981) (seasonableness of lay consumer's notice by filing action within statute of limitations is a jury question when policies behind notice requirement are fulfilled). Accordingly, the Court will **DENY** Ford's motion to dismiss the implied warranty claims as to Plaintiffs Droesser (KS), Bauers (IN), and Stidham (NC).

### 4.    Michigan and Alabama

Michigan and Alabama have strict notice requirements that bar claims from buyers who do not provide pre-suit notice of breach. *Gorman v. Am. Honda Motor Co., Inc.*, 839 N.W.2d 223, 230, 232 (Mich. Ct. App. 2013) (rejecting argument that Michigan law does not require pre-suit notice and affirming dismissal against plaintiff who failed to provide notice prior to filing suit regardless of whether defendant had actual knowledge); *Parker v. Bell Ford, Inc.*, 425 So. 2d 1101, 1102-03 (Ala. 1983) (holding that notice is a condition precedent to recovery and affirming directed verdict against plaintiff who failed to provide notice prior to filing suit). Accordingly, the Court will **GRANT** Ford's motion to dismiss the implied warranty claims as to Plaintiffs Fowlkes (MI), Reeves (AL), and Doa (MI).

34

### E.     Privity

Ford moves to dismiss the following implied warranty claims for lack of privity: Droesser (KS), Fowlkes (MI), Parker (OH), Meehan (OH), Saddler (OH), Tremblay (FL), Ponteaux (FL), Mertz (CA), Sawicki (CA), Reeves (AL), Bauers (IN), Markovich (IL), Stidham (NC), Doa (MI), and Eriv (NJ). Ford stresses that the UCC implied warranty of merchantability applies exclusively to sellers. U.C.C. § 2-314(1). The SAC alleges that the above Plaintiffs purchased new and used class vehicles from Ford dealerships, other dealerships, and private sellers. In UCC parlance, Plaintiffs were the "buyers," but Ford was the "manufacturer" – not the "seller." While extending to some beneficiaries in horizontal privity with buyers, the UCC is neutral as to requiring vertical privity between buyers and remote manufacturers. *Id.* § 2-318 & cmt. 3. Ford argues that dismissal is appropriate because the states where Plaintiffs purchased class vehicles have a privity requirement barring implied warranty claims against remote manufacturers. Plaintiffs counter that some of the states do not have a privity requirement and the remaining states have agency, direct dealings, and third-party beneficiary exceptions.

Because the UCC is neutral as to requiring vertical privity between buyers and remote manufacturers, privity issues must be analyzed on a state-by-state basis. Before turning to that analysis, some ground rules are in order. First, the Court exercised some discretion when construing the parties' positions. While they have

generally presented the Court with persuasive authority for each state, in many instances the parties' "arguments" can only be understood by examining the pertinent authorities and studying the record.

Second, the parties dispute whether some states have a privity requirement. Sometimes the state has not abolished the privity requirement, and the real dispute is whether the state requires privity for Plaintiffs' implied warranty claims (e.g., because the privity requirement does not apply to consumer transactions). But instead of properly framing the dispute, Plaintiffs maintain that "certain states, including [State X], do not require privity for warranty claims," adding the non-explanatory parenthetical "[State X]" to an authority in a footnote string citation. (ECF No. 53, PageID.18647).

The Court will proceed as follows. Where Plaintiffs cite to authorities whose applicability is apparent from the record, the Court will treat the citation as an argument that the state does not require privity for the implied warranty claims. Otherwise, absent an explanation to the contrary, the Court deems Plaintiffs to have conceded that the relevant state has a privity requirement.

Third, the parties appear to agree that the remaining states have a privity requirement and instead dispute whether there exists some form of exception. Some states do not recognize an exception or recognize an exception that courts have not applied in the automotive sales context. Pointing to the existence of exceptions

generally, Plaintiffs argue that dismissal is inappropriate because privity determinations are fact-bound and therefore improper to resolve on a Rule 12(b)(6) motion.

The Court will proceed as follows.  Where Plaintiffs present the Court with applicable authority, it will address Plaintiffs' arguments regarding exceptions to the privity requirement. For instance, where Plaintiffs cite a federal court decision for an exception, the Court will treat the citation as an argument that the applied state law recognizes the exception. Insofar as the state recognizes the exception, the Court will consider whether Plaintiffs plausibly qualify for the exception under state law. Absent contrary authority, the Court will dismiss those claims where no specific state law authorizes a privity exception. *Cf. In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 806-07 (N.D. Ill. 2016) (denying motion to dismiss implied warranty claims under the laws of multiple states in part because plaintiffs plausibly alleged support for an exception recognized in one state).

### 1.   Kansas

While Kansas has not abolished the privity requirement, the parties dispute whether Kansas requires privity for the implied warranty claims. In *Professional Lens*, the Kansas Supreme Court held that implied warranties under the Kansas UCC "are not extended to a remote seller or manufacturer of an allegedly defective

product" for "only economic loss suffered by a buyer who is not in contractual privity with the remote seller or manufacturer." *Prof'l Lens Plan, Inc. v. Polaris Leasing Corp.*, 234 Kan. 742, 755 (1984). Kansas has since enacted the Kansas Consumer Protection Act ("KCPA"). The statute provides that "[n]otwithstanding any provision of law, no action for breach of warranty with respect to property subject to a consumer transaction shall fail because of a lack of privity between the claimant and the party against whom the claim is made." KAN. STAT. ANN. § 50-639(b).

A Kansas federal district court has concluded that section 50-639(b) to the KCPA "has abolished any privity requirement in an action for breach of the implied warranty of merchantability involving a consumer transaction under Kansas law." *Gonzalez v. PepsiCo, Inc.*, 489 F. Supp. 2d 1233, 1246 (D. Kan. 2007). The district court reached this conclusion following an extensive analysis of Kansas law. *Id.* at 1243-46. Among other things, in the commentary to section 50-639(b), as well as Kansas's UCC, the statutes themselves suggest that the KCPA substantively modifies the Kansas UCC. *Id.* at 1243 (citing KAN. STAT. ANN. § 50-639(b) cmt. 3 ("eliminates once and for all the concepts of 'vertical' and 'horizontal' privity"); KAN. STAT. ANN. § 84-2-318 cmt. 1 ("abolished both horizontal and vertical privity in all consumer warranty cases").

The Court agrees with the district court's interpretation of Kansas law and concludes that for consumer transactions, Kansas does not have a privity requirement barring implied warranty claims against remote manufacturers. While Ford cites a decision where a Kansas appellate court rejected the plaintiff's KCPA claim, that case went to great lengths to explain why the plaintiff was not a consumer. *Limestone Farms, Inc. v. Deere & Co.*, 29 Kan. App. 2d 609, 613-14 (2001). Accordingly, the Court will **DENY** Ford's motion to dismiss the implied warranty claims as to Plaintiff Droesser (KS).

### 2.    Michigan

The parties dispute whether Michigan has a privity requirement. In *Pack*, the Sixth Circuit observed that "Michigan law has not settled whether privity is required to bring an implied-warranty claim under the MUCC." *Pack v. Damon Corp.*, 434 F.3d 810, 818 (6th Cir. 2006) (citing MICH. COMP. LAWS § 440.2314). The Sixth Circuit proceeded to analyze how the Michigan Supreme Court would decide the question and concluded that "Michigan has abandoned the privity requirement for implied-warranty claims." *Id.* at 820.

While arguing that Michigan has a privity requirement, Ford does not point to any further development of Michigan law. Rather, Ford cites to the line of federal district court decisions that the Sixth Circuit effectively overruled. *Id.* at 819-20. The Court is bound by the Sixth Circuit's interpretation of Michigan law and concludes

that Michigan does not have a privity requirement barring implied warranty claims against remote manufacturers. Accordingly, the Court will **DENY** Ford's motion to dismiss the implied warranty claims as to Plaintiffs Fowlkes (MI) and Doa (MI).

### 3. Ohio

While Ohio has not abolished the privity requirement, the parties dispute whether Ohio requires privity for the implied warranty claims. In *Curl*, the Ohio Supreme Court held that "Ohio continues to require privity as to contract claims," and under the Ohio UCC, "purchasers of automobiles may assert a contract claim for breach of implied warranty only against parties with whom they are in privity." *Curl v. Volkswagen of Am., Inc.*, 114 Ohio St. 3d 266, 271-72 (2007); *see also Tsirikos v. Ford Motor Co.*, 99 N.E.3d 1203, 1212 (Ohio Ct. App. 2017) (noting that "it is a well-accepted principle that there is no privity between a vehicle's manufacturer and the ultimate consumer because the dealer, generally, does not act as the manufacturer's agent").

Plaintiffs, however, assert a claim for breach of implied warranty that sounds in tort. (ECF No. 44, PageID.14668-14669, ¶¶ 1352-1357). The Ohio Supreme Court's *Lonzrick*, *Iacono*, and *Chemtrol* decisions establish that Ohio does not have a privity requirement for such claims.

As far back as the mid-1960s, it was "settled law" that "there can be an action in tort, based upon breach of warranty, and no contractual relation between the

40

plaintiff and the defendant is required." *Lonzrick v. Republic Steel Corp.*, 6 Ohio St.

2d 227, 236 (1966).

In *Lonzrick*, the Ohio Supreme Court extended this principle to "breach of the

representations which are implicit when a defendant manufactures and sells a

product which, if defective, will be a dangerous instrumentality." *Id.* at 240. In

*Iacono*, the Ohio Supreme Court extended *Lonzrick* beyond personal injuries,

holding that "an action in tort, based on the properly pleaded theory of breach of

implied warranty, may be maintained to recover for damage to property." *Iacono v.*

*Anderson Concrete Corp.*, 42 Ohio St. 2d 88, 93 (1975). Then in *Chemtrol*, the Ohio

Supreme Court explained that the "property" damages at issue in *Iacono* "were in

fact merely defects in the product itself which reduced the product's value," and held

that "an action in tort for breach of express or implied warranty … may be

maintained for purely economic loss." *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut.*

*Ins. Co.*, 42 Ohio St. 3d 40, 49-50 (1989).

This line of precedent supports the conclusion that "Ohio's implied warranty

in tort claim effectively extends the UCC's implied warranty protections to

purchasers who are not in privity with the party against whom they seek to assert

their claim." *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 865 (S.D. Ohio

2012). Accordingly, the Court will **DENY** Ford's motion to dismiss the implied

warranty claims as to Plaintiffs Parker (OH), Meehan (OH), and Saddler (OH).

### 4.      Florida

Florida has a privity requirement. "Under Florida law, privity of contract is required to maintain an action for breach of an implied warranty." *Ocana v. Ford Motor Co.*, 992 So. 2d 319, 325 (Fla. Dist. Ct. App. 2008); *see also Kramer v. Piper Aircraft Corp.*, 520 So. 2d 37 (Fla. 1988).  The parties' dispute centers upon whether Florida has a third-party beneficiary exception.

The parties cite two conflicting decisions from the United States District Court for the Southern District of Florida. Plaintiffs cite the earlier *Sanchez-Knutson* decision, where the district court concluded that Florida recognizes a third-party beneficiary exception. *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1234 (S.D. Fla. 2014). Ford relies on the later *Padilla* decision, where the district court declined to follow *Sanchez-Knutson* as inconsistent with both "its own prior rulings" and the "overwhelming weight of Florida authority." *Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1117 (S.D. Fla. 2019). "Time and again," the *Padilla* Court explained, "Florida courts have dismissed breach of implied warranty claims under Florida law for lack of contractual privity where the plaintiff purchaser did not purchase a product directly from the defendant." *Id.* at 1116 (collecting cases); *see also id.* at 1117 & n.3 (collecting cases declining to follow *Sanchez-Knutson*).

The Court concurs with the *Padilla*'s interpretation of Florida law and concludes that the state does not recognize a third-party beneficiary exception.

Plaintiffs insist that Florida also maintains an agency exception. While Florida does recognize an agency exception, in *Ocana*, the Florida District Court of Appeal rejected the plaintiff's agency argument as to automakers and dealerships, holding that the plaintiff "cannot execute an end-run around Florida's historic privity requirement by employing principal-agent theory." *Ocana*, 992 So. 2d at 326.

The SAC alleges that Ford and its dealers have an agency relationship and it details Ford's requirements for sales reporting, training, maintenance and service departments, warranty work, floor plans, and logos. (ECF No. 44, PageID.14368-14372, ¶ 224). But in *Ocana*, the Florida District Court of Appeal addressed similar allegations and concluded that they "fall far short of those necessary to establish a principal-agent relationship" under Florida law. *Ocana*, 992 So. 2d at 326. The District Court of Appeal explained that the complaint "is devoid of any allegation of some of the tell-tale signs of a principal-agent relationship, such as the ability of the principal to hire, fire, or supervise dealership employees or dealer ownership." *Id.* Based on *Ocana*, the SAC falls short of plausibly alleging support for an agency exception under Florida law.

Having concluded that Florida does not recognize a third-party beneficiary exception and that no plausible allegations support an agency exception, the Court

will **GRANT** Ford's motion to dismiss the implied warranty claims as to Plaintiffs Tremblay (FL) and Ponteaux (FL).

### 5.    California

Plaintiffs assert two claims of breach of the implied warranty of merchantability – one under the California UCC and one under the Song-Beverly Act. California does not have a privity requirement barring implied warranty claims against remote manufacturers under the Song-Beverly Act. CAL. CIV. CODE § 1792 ("every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable"). Accordingly, the Court will **DENY** Ford's motion to dismiss the implied warranty claims under the Song-Beverly Act as to Plaintiffs Mertz (CA) and Sawicki (CA).

On the other hand, California has a privity requirement for UCC implied warranty claims. In *Clemens*, the United States Ninth Circuit Court of Appeals observed that "California courts have painstakingly established the scope of the privity requirement under California Commercial Code section 2314." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008) (citing CAL. COM. CODE § 2314). In California, "a plaintiff asserting breach of warranty claims must stand in vertical contractual privity with the defendant," meaning that "they are in

44

adjoining links of the distribution chain." *Id.* at 1023. "Thus, an end consumer …
who buys from a retailer is not in privity with a manufacturer." *Id.*

Here, the parties dispute whether California has a third-party beneficiary
exception to the privity requirement. The parties cite diverging opinions among
California's federal district courts regarding whether "a third-party beneficiary
exception to privity" exists "in the consumer warranty context." *Stewart v.
Electrolux Home Prods., Inc.*, 304 F. Supp. 3d 894, 914 (E.D. Cal. 2018).

In *Stewart*, the district court explained that the split in authority emerged
following the Ninth Circuit's *Clemens* decision and focuses on the California Court
of Appeal's *Gilbert* decision. *Id.* at 914 (citing *Gilbert Fin. Corp. v. Steelform
Contracting Co.*, 82 Cal. App. 3d 65 (1978)). Some federal district courts "have
interpreted *Clemens* to foreclose application of the third-party-beneficiary exception"
while other district courts "have distinguished *Clemens* on the ground that it did not
expressly consider a third-party-beneficiary exception." *Id.* & n.10, 11 (collecting
cases).

The Court will follow *Stewart*. There, the district court concluded that
"*Gilbert* involved a subcontractor who was building a roof for a specific, identifiable
customer" and that "there is no published California authority recognizing this
exception to privity in the consumer warranty context." *Id.* at 915. "Standing alone,
*Gilbert* is not sufficient to establish that the third-party-beneficiary exception is

within the scope of the privity exceptions California courts have painstakingly established." *Id.* (quotation omitted). Accordingly, the Court will **GRANT** Ford's motion to dismiss the California UCC implied warranty claims as to Plaintiffs Mertz (CA) and Sawicki (CA).

### 6. Alabama

Alabama maintains a privity requirement. In *Rhodes*, the Alabama Supreme Court affirmed summary judgment for an automaker on the plaintiffs' implied warranty claim, holding that the automaker is the "manufacturer" and that "without privity of contract, there is no right of action against a manufacturer for direct economic loss." *Rhodes v. Gen. Motors Corp.*, 621 So. 2d 945, 947 (Ala. 1993). This is because "each section in the Uniform Commercial Code dealing with implied warranties places obligations on the seller of goods." *Id.* (citing ALA. CODE § 7-2-103(1)(d)). And "[r]egardless of any express warranties that a manufacturer may wish to give with a product, by their very language the commercial code's implied warranty sections apply to the *seller* of the product." *Id.* (quotation omitted) (emphasis in original).

Here, again, the parties dispute whether Alabama has a third-party beneficiary exception. But in *McGowan*, the Alabama Supreme Court rejected the plaintiff's third-party beneficiary argument as to automakers and dealerships. *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 848 (Ala. 1993). "It has long been the rule in

Alabama that one who seeks recovery as a third-party beneficiary of a contract must establish that the contract was intended for his direct, as opposed to his incidental, benefit." *Id.* (cleaned up). The Alabama Supreme Court found no substantial evidence that the plaintiff "was either a direct or an intended beneficiary, as opposed to an incidental beneficiary" of the contract between Chrysler and a Chrysler dealership. *Id.* "The primary purpose," it explained, "was to promote Chrysler's reputation and that of its dealers, by ensuring that purchasers of Chrysler cars would receive warranty service and quality replacement parts for their cars at Chrysler dealerships." *Id.*

Based upon *McGowan*, the Court finds that Plaintiffs do not plausibly establish that Alabama recognizes a third-party beneficiary exception to the privity requirement. Accordingly, the Court will **GRANT** Ford's motion to dismiss the implied warranty claims as to Plaintiff Reeves (AL).

### 7.    Indiana

While Indiana has not abolished the privity requirement, the parties dispute whether Indiana requires privity for the implied warranty claims. In *Goodin*, the Indiana Supreme Court definitively held that "Indiana law does not require vertical privity between a consumer and a manufacturer as a condition to a claim by the consumer against the manufacturer for breach of the manufacturer's implied warranty of merchantability." *Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947,

959 (Ind. 2005) (applying IND. CODE § 26-1-2-314). Consequently, the Court finds that, for the implied warranty claims, Indiana does not have a privity requirement barring causes of action against remote manufacturers.[3] The Court will, therefore, **DENY** Ford's motion to dismiss the implied warranty claims as to Plaintiff Bauers (IN).

### 8. Illinois

Illinois has a privity requirement. In *Szajna*, the Illinois Supreme Court "decline[d] to abolish the privity requirement in implied-warranty economic-loss cases." *Szajna v. Gen. Motors Corp.*, 115 Ill. 2d 294, 311 (1986). But Plaintiffs raise an argument (which Ford does not address) that Illinois has third-party beneficiary and direct dealings exceptions.

An Illinois federal district court has concluded that "Illinois recognizes various exceptions to the privity requirement." *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 704 (N.D. Ill. 2016). "Given the fact-intensive nature of the privity inquiry," the district court explained, "a determination as to whether privity exists is often not appropriate at the motion-to-dismiss stage." *Id.* at 704-05 (cleaned up). The district court reached this conclusion in connection with an

---

[3] Ford cites a decision where a federal district court listed Indiana among states that require privity, but it further clarifies that "Indiana law requires privity for claims based on the implied warranty of fitness for a particular purpose but not the implied warranty of merchantability." *In re Rust-Oleum Restore*, 155 F. Supp. 3d 772 at 806.

extensive analysis of Illinois law, including a discussion of the third-party beneficiary and direct dealings exceptions. *Id.* at 705-06; *see also Flynn v. FCA US, LLC*, 327 F.R.D. 206, 217 (S.D. Ill. 2018) ("Illinois law requires privity for an implied warranty claim" but "[p]rivity inquiries into the relationship between a purchaser, a seller, and a manufacturer are fact-intensive").

While arguing that Illinois has a privity requirement, Ford does not address whether Illinois has third-party beneficiary and direct dealings exceptions, or whether privity determinations under Illinois law are fact-bound and therefore improper on a Rule 12(b)(6) motion. Accordingly, the Court will **DENY** Ford's motion to dismiss the implied warranty claims as to Plaintiff Markovich (IL).

### 9.    North Carolina

North Carolina has a privity requirement. In North Carolina, "the general rule is that privity is required to assert a claim for breach of an implied warranty involving only economic loss." *Energy Inv'rs Fund, L.P. v. Metric Constructors, Inc.*, 525 S.E.2d 441, 446 (N.C. 2000). While the parties likewise dispute whether North Carolina has a third-party beneficiary exception, Plaintiffs raise a statutory argument (which Ford does not address) that the North Carolina UCC does not require privity for the implied warranty claims. More specifically, Plaintiffs cite the definition of "seller," where the North Carolina UCC provides that "[a]ny manufacturer of self-propelled motor vehicles, as defined in G.S. 20-4.01, is also a 'seller' with respect

to buyers of its product to whom it makes an express warranty, notwithstanding any lack of privity between them, for purposes of all rights and remedies available to buyers under this Article." N.C. GEN. STAT. § 25-2-103(1)(d); *see also Alberti v. Manufactured Homes, Inc.*, 407 S.E.2d 819, 823 (N.C. 1991) ("an automobile manufacturer who issues an express warranty to buyers of its product is a 'seller' under Article 2."). Accordingly, the Court will **DENY** Ford's motion to dismiss the implied warranty claims as to Plaintiff Stidham (NC).

### 10. New Jersey

The parties dispute whether New Jersey has a privity requirement. But in *Spring Motors*, the New Jersey Supreme Court held that "the buyer need not establish privity with the remote supplier to maintain an action for breach of express or implied warranties." *Spring Motors Distribs., Inc. v. Ford Motor Co.*, 98 N.J. 555, 561 (1985). While arguing that New Jersey has a privity requirement, Ford has not presented the Court with any relevant authorities. In the absence of conflicting precedent, the Court therefore concludes that New Jersey does not have a privity requirement barring implied warranty claims against remote manufacturers. Accordingly, the Court will **DENY** Ford's motion to dismiss the implied warranty claims as to Plaintiff Eriv (NJ).

### F.    Magnuson-Moss Warranty Act

Plaintiffs assert the MMWA claim on behalf of themselves and the nationwide class. The MMWA provides consumers with an action for damages against suppliers and warrantors who fail to comply with their obligations under the MMWA or obligations under written and implied warranties. 15 U.S.C. § 2310(d)(1). Ford moves to dismiss Plaintiffs' MMWA claim because, among other things, (1) the classwide MMWA claim lacks one hundred named plaintiffs, and (2) several Plaintiffs lack the predicate state law warranty claims necessary to advance their own individual MMWA claims.

### 1.    The Classwide MMWA Claim

Regarding the classwide MMWA claim, Plaintiffs invoke jurisdiction under the Class Action Fairness Act ("CAFA"), codified in relevant part in amendments to 28 U.S.C. § 1332. The CAFA provides federal district courts with original jurisdiction over diversity class actions. *Id.* § 1332(d). The parties do not dispute that the statutory amount in controversy and the CAFA's diversity requirements are satisfied. *Id.* § 1332(d)(2)(A).

But the parties also do not contest that the Court lacks subject-matter jurisdiction under the MMWA. In its jurisdiction provision, the MMWA generally allows plaintiffs to file individual or class actions in state courts or federal district

courts. For class actions filed in federal district court, the MMWA has a "numerosity" requirement of no less than 100 named plaintiffs. 15 U.S.C. § 2310(d)(3)(C).

Because the eighteen named Plaintiffs do not meet the numerosity requirement, Ford argues that dismissal is appropriate since the Court lacks jurisdiction over the classwide MMWA claim. Plaintiffs respond that the Court has jurisdiction over the classwide MMWA claim on account of the CAFA. The parties rely on divergent, nonbinding authority from the only two circuits to address the question. Plaintiffs urge the Court to follow the Sixth Circuit's unpublished *Kuns* decision. Ford asks the Court to follow the Ninth Circuit's published decision in *Floyd*.

In *Kuns*, the Sixth Circuit observed that it was the first court of appeals to address "the jurisdictional interplay of the CAFA and the MMWA." *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013). And it endorsed the view that "the CAFA effectively supercedes the MMWA's more stringent jurisdictional requirements." *Id.*

On the other hand, in *Floyd*, the Ninth Circuit decided that the MMWA has a "plain meaning" and that the CAFA has not "impliedly repealed" its numerosity requirement. *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1034 (9th Cir. 2020). The *Floyd* panel ultimately concluded that "the statutory language of the MMWA and of CAFA is not irreconcilable—the MMWA simply prevents claims under that

Act from proceeding in federal court absent the satisfaction of certain jurisdictional prerequisites." *Id.*

The Ninth Circuit's analysis is more persuasive. *See In re Blasingame*, 986 F.3d 633, 637 n.2 (6th Cir. 2021) (holding that unpublished Sixth Circuit decisions are not "binding authority"). "Construing CAFA to provide jurisdiction over MMWA claims despite Plaintiffs' failure to satisfy the plain-language requirement of at least one hundred named plaintiffs would have the effect of overriding a part of the MMWA." *Floyd*, 966 F.3d at 1035. And without a "clear and manifest" intent to partially repeal the MMWA, this Court cannot envision that Congress intended the CAFA to "be used to evade or override the MMWA's specific numerosity requirement." *Id.* Accordingly, the Court will **GRANT** Ford's motion to dismiss the classwide MMWA claim because the SAC fails to name at least one hundred plaintiffs.

### 2.     The Individual MMWA Claims

The parties appear to agree that "if there exists no actionable warranty claim, there can be no violation of the [MMWA]." *Temple v. Fleetwood Enters.*, 133 Fed. App'x. 254, 268 (6th Cir. 2005); *see also* 15 U.S.C. § 2301(7) ("The term 'implied warranty' means an implied warranty arising under State law … in connection with the sale by a supplier of a consumer product."). Having already granted Ford's motion to dismiss the implied warranty claims with respect to some of the Plaintiffs,

the Court will **GRANT** Ford's motion to dismiss the MMWA claims of those sae Plaintiffs, namely Fowlkes (MI), Tremblay (FL), Ponteaux (FL), Mertz (CA - UCC only), Sawicki (CA - UCC only), Reeves (AL), and Doa (MI).

## VII.     FRAUD-BASED CLAIMS

Ford moves to dismiss the consumer protection and unjust enrichment claims under the respective state laws where Plaintiffs reside or purchased the class vehicles. The parties explain that the consumer protection and unjust enrichment claims "sound in fraud." To allege fraud, plaintiffs must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

### A.     All Fraud-Based Claims

Ford moves to dismiss all the fraud-based claims. The parties appear to agree that the relevant issues are whether Plaintiffs (1) allege fraud with particularity, (2) adequately plead knowledge, and (3) adequately plead a duty to disclose. For the reasons set forth below, the Court finds that Plaintiffs have met the heightened pleading standard for fraudulent omissions and have adequately plead Ford's knowledge of and duty to disclose the alleged defects. Accordingly, the Court will **DENY** Ford's motion to dismiss all the fraud-based claims.

### 1.     Particularity

For claims involving misrepresentation, the Sixth Circuit has held that Rule 9(b) requires plaintiffs to "allege the time, place, and content of the alleged

misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 551 (6th Cir. 2012) (quotation omitted). As for claims involving fraudulent omissions, the Sixth Circuit has held that Rule 9(b) requires plaintiffs to "specify the who, what, when, where, and how of the alleged omission." *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255-56 (6th Cir. 2012) (quotation omitted).

Plaintiffs must specifically plead (1) precisely what was omitted, (2) who should have made a representation, (3) the content of the alleged omission and the manner in which the omission was misleading, and (4) what [the defendant] obtained as a consequence of the alleged fraud." *Id.* at 256. Plaintiffs here face a "slightly more relaxed pleading burden" because they "will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Matanky*, 370 F. Supp. 3d at 789 (quotation omitted).

In the current motion, Ford addresses theories of both fraudulent misrepresentation and fraudulent omission. But since Plaintiffs affirmatively argue for the relaxed pleading burden, and focus on the elements of fraudulent omission, the Court deems Plaintiffs to have limited themselves to an omission theory. (ECF No. 53, PageID.18631).

Under that theory, Plaintiffs have satisfied the pleading requirements delineated in automobile defect cases. More specifically, the SAC plausibly alleges (1) the "who" (Ford); (2) the "what" (knowing about, yet failing to disclose, the alleged defects with the CP4 pump); (3) the "when" (from the time the class vehicles were first placed on the market to the present day); (4) the "where" (the various channels through which Ford sold the class vehicles); and (5) and the "how" (if Plaintiffs had known of the alleged defect, they would not have purchased class vehicles or would have paid less for them). *See*, *e.g.*, *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751-52 (E.D. Mich. 2017); *McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 761 (E.D. Mich. 2019); *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 636 (E.D. Mich. 2019). Accordingly, the Court finds that Plaintiffs have met the heightened pleading standard for fraudulent omissions.

### 2. Knowledge

The SAC adequately puts Ford on notice of the nature of the fraud-based claims. Ford takes issue with some of the allegations that pre-date the events of this case. For example, Plaintiffs look back to the 1990s to allege industrywide catastrophic failures in fuel injection systems traced to U.S. diesel fuel standards. (ECF No. 44, PageID.14211, 14286, ¶¶ 8, 127). But Plaintiffs also reference Ford emails from 2009 through 2012 to allege that the failures persisted and that Ford was

aware that U.S. diesel fuel largely fell outside U.S. standards. (ECF No. 45 *SEALED*, PageID.17663-17668, ¶ 141).

Reading these allegations in Plaintiffs' favor, they support the reasonable inference that Ford would have been aware of any problems with the CP4 pump that implicate the alleged defects. Plaintiffs also allege that Ford knew the catastrophic failures were widespread in diesel vehicles equipped with the CP4 pump because of the NHTSA investigation. (ECF No. 44, PageID.14305-14310, ¶¶ 152-153). And while Ford objects to Plaintiffs' reliance on certain documents, the SAC alleges that automakers have dedicated departments to track problems with commonly used components. (*Id.*, PageID.14311, ¶ 154). Since Ford uses the CP4 pump and participated in the NHTSA investigation, Plaintiffs' allegations support the reasonable inference that Ford would have tracked the submissions from other companies.

The SAC contains allegations that *directly* implicate Ford and the class vehicles as well. Plaintiffs allege that Ford experienced problems with metal deposits during the 2009 preproduction phase. (*Id.*, PageID.14303, ¶ 149). In 2011, Ford activated a job aid for Ford dealerships to address failures caused by the alleged defects. (*Id.*, PageID.14323, ¶ 177). And as noted above, Plaintiffs cite to the analysis of field returns of CP4 pumps removed from 2011 class vehicles, where Ford identified that some of the failures implicate the alleged defects. (ECF No. 44-

22, PageID.15404-15426). Accepting these allegations as true, the Court finds that the SAC adequately pleads Ford's knowledge of the alleged defects.

### 3. Duty to Disclose

This case involves latent safety defects. The SAC alleges that Ford had a duty to disclose the defects because of its superior knowledge about what caused the catastrophic failures. (ECF No. 44, PageID.14396-14397, ¶ 282). These catastrophic failures pose a continuing safety risk because they make the class vehicles shut off in motion without the ability to restart and lead to repair costs of at least $10,000. (*Id.*, PageID.14208-14209, ¶¶ 3-4). Plaintiffs allege that in the absence of catastrophic failures, the alleged defects are undiscoverable to average consumers because the fuel injection system is an internal component within the class vehicles. (*Id.*, PageID.14412, ¶ 343).

The parties dispute the scope of the duty to disclose, warranting a state-by-state analysis. At this stage of the case, however, the Court finds that Plaintiffs adequately plead Ford's superior knowledge of the alleged defects, and plausibly establish a duty to disclose the alleged defects because of the causal link to the catastrophic failures.

### B. Unjust Enrichment Claims

Ford moves to dismiss the following unjust enrichment claims: Fowlkes (MI), Wentz (PA), Tremblay (FL), Ponteaux (FL), Reeves (AL), Bauers (IN), Markovich

(IL), and Doa (MI). At the class action pleading stage, "the typical elements of a state-law claim for unjust enrichment are (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant accepted the benefit, and (3) injustice would occur if the defendant did not pay the plaintiff for the value of the benefit." *Raymo*, 475 F. Supp. 3d at 709. Ford argues that dismissal is appropriate because the company did not directly receive a benefit from the class vehicle purchases and that the NVLW and other legal remedies preclude relief. Plaintiffs respond that Ford clearly received a benefit and that the NVLW and other legal remedies pose no bar to relief.

The Court declines to dismiss the unjust enrichment claims. Ford is the only party to raise any issues with respect to the NVLW. Plaintiffs do not assert any claims for breaching the NVLW, and the claims that they do assert are based on Ford's pre-sale conduct, which falls outside its scope. In addition to the overpayment theory, the SAC alleges economic injury for repair costs at Ford dealerships, which plausibly benefitted Ford at Plaintiffs' expense. While other legal remedies may ultimately preclude relief, at this stage of the case, Plaintiffs may assert the unjust enrichment claims. Accordingly, the Court will **DENY** Ford's motion to dismiss those causes of action.

## VIII.    ADDITIONAL REASONS FOR DISMISSAL

### A.    Economic Loss Doctrine

Ford moves to dismiss the following consumer protection and unjust enrichment claims as barred under the economic loss doctrine: Droesser (KS), Fowlkes (MI), Wentz (PA), Tremblay (FL), Ponteaux (FL), Bauers (IN), and Doa (MI). Ford argues that dismissal is appropriate because the economic loss doctrine bars fraud-based claims under the respective state laws. Plaintiffs respond that dismissal is not appropriate because the listed states recognize a fraud exception to the economic loss doctrine. Since it has already concluded that Plaintiffs adequately plead fraudulent omission, the Court will **DENY** Ford's motion to dismiss the consumer protection and unjust enrichment claims.

### B.     Louisiana LCPL Claim

On behalf of themselves and the Louisiana sub-class, Plaintiffs assert (1) violations of Louisiana's Unfair Trade Practices and Consumer Protection Law ("LCPL"), LA. STAT. ANN. §§ 51:1401 *et seq.*, and (2) a claim for breach of the warranty against redhibitory defects.[4] LA. CIV. CODE Arts. 2520, 2524. Ford moves to dismiss the LCPL claim based on another statute, the Louisiana Products Liability Act ("LPLA"), LA. STAT. ANN. §§ 2800.51 *et seq.* Ford argues that dismissal is

---

[4] "A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." LA. CIV. CODE Art. 2520. "A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price." *Id.*

appropriate because the LPLA provides the exclusive remedy for damages caused by a manufacturer's product that are not recoverable in redhibition. *Id.* §§ 2800.52 (providing "the exclusive theories of liability for manufacturers for damage caused by their products"), 2800.53(5) ("Damage" defined as "all damage caused by a product" including "damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that [redhibition] does not allow recovery for such damage or economic loss"). Since Plaintiffs do not contest Ford's position on this theory of liability, the Court will **GRANT** Ford's motion to dismiss the LCPL claim.

### C.    Michigan MCPA Claim

On behalf of themselves and the Michigan sub-class, Plaintiffs assert a Michigan Consumer Protection Act ("MCPA") claim, MICH. COMP. LAWS §§ 445.901 *et seq.* The MCPA includes a statutory exemption for "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." *Id.* § 445.901(1)(a). "The burden of proving an exemption from this act is upon the person claiming the exemption." *Id.* § 445.901(4). Ford argues that dismissal is appropriate because the manufacture and sale of vehicles is specifically authorized under federal and state law. Plaintiffs respond that dismissal is not appropriate because Ford has not met its burden of establishing an exemption.

The Court sides with Ford on this score. The Michigan Supreme Court has construed the statutory exemption broadly. *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 38 (Mich. 1999) (stating that exemption applies where "general transaction" is "specifically authorized by law"); *Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 520 (Mich. 2007) (stating that exemption applies where "general transaction" is "explicitly sanctioned"). In *Cyr*, the Michigan Court of Appeals applied Michigan Supreme Court precedent and held that "the manufacture, sale, and lease of automobiles, and the provision of express and implied warranties concerning those automobiles and their components are all conduct that is specifically authorized under federal and state law." *Cyr v. Ford Motor Co.*, No. 345751, 2019 Mich. App. LEXIS 8347, at *5 (Mich. Ct. App. Dec. 26, 2019) (quotation omitted). Other courts in this district have reached the same conclusion. *See*, *e.g.*, *Matanky*, 370 F. Supp. 3d at 799-800 (applying *Liss*); *Gant v. Ford Motor Co.*, 517 F. Supp. 3d 707, 719-20 (E.D. Mich. 2021) (following *Cyr*); *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 275-76 (E.D. Mich. 2021) (following *Cyr*); *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1301-02 (E.D. Mich. 2021) (following *Cyr*). Accordingly, the Court will **GRANT** Ford's motion to dismiss the MCPA claim.

### D.     Timeliness

Ford moves to dismiss the following consumer protection claims on timeliness grounds: Droesser (KS), Ford (LA), Parker (OH), Meehan (OH),

Tremblay (FL), Ponteaux (FL), Reeves (AL), Angona (LA), Markovich (IL), and Eriv (NJ). For the same reason, Ford moves to dismiss the following implied warranty claims: Droesser (KS), Ford (LA), Fowlkes (MI), Parker (OH), Tremblay (FL), Ponteaux (FL), Mertz (CA), Reeves (AL), Bauers (IN), Angona (LA), Markovich (IL), Stidham (NC), and Eriv (NJ). Ford explains that the states where Plaintiffs purchased class vehicles have one-to-six year statutes of limitations for consumer protection law violations and four-year statutes of limitations for claims alleging breach of the implied warranty of merchantability. Assuming the limitations periods began to run on the purchase dates, Ford argues that dismissal is appropriate because the applicable limitations periods expired before Plaintiffs filed the initial complaint.

Plaintiffs respond that because this case involves latent safety defects, the discovery rule and fraudulent concealment principles require tolling the limitations period.  According to Plaintiffs, dismissal is not appropriate because the parties dispute when the consumer protection and implied warranty claims accrued and when the relevant limitations period expired.

The Court agrees with Plaintiffs. The Sixth Circuit has explained that "courts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date." *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016). "Examples of

such disputed factual questions include claims that the defendant fraudulently concealed facts, thereby preventing the plaintiff from learning of its injury, and complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim." *Id.* (internal citations omitted). Accordingly, the Court will **DENY** Ford's motion to dismiss the above consumer protection and implied warranty claims.

## IX.    CONCLUSION

In view of the foregoing, it is hereby,

ORDERED that Ford's motion to dismiss the second amended class action complaint (ECF No. 49) is granted in part and denied in part.

IT IS FURTHER ORDERED that the following causes of action are dismissed:

- Plaintiff Fowlkes' claim of breach of the implied warranty of merchantability under Michigan law (Michigan Sub-Class, COUNT III);

- Plaintiff Tremblay's claim of breach of the implied warranty of merchantability under Florida law (Florida Sub-Class, COUNT III);

- Plaintiff Ponteaux's claim of breach of the implied warranty of merchantability under Florida law (Florida Sub-Class, COUNT III);

- Plaintiff Mertz's claim of breach of the implied warranty of merchantability under the California UCC (California Sub-Class, COUNT III);

- Plaintiff Sawicki's claim of breach of the implied warranty of merchantability under the California UCC (California Sub-Class, COUNT III);

- Plaintiff Reeves's claim of breach of the implied warranty of merchantability under Alabama law (Alabama Sub-Class, COUNT III);

- Plaintiff Doa's claim of breach of the implied warranty of merchantability under Michigan law (Michigan Sub-Class, COUNT III);

- The classwide Magnuson-Moss Warranty Act claim (Multi-State Claims, COUNT I);

- The individual Magnuson-Moss Warranty Act claims for Plaintiffs Fowlkes, Trembly, Ponteaux, Mertz, Sawicki, Reeves, and Doa;

- The Louisiana Unfair Trade Practices and Consumer Protection Law claim (Louisiana Sub-Class, COUNT I); and

- The Michigan Consumer Protection Act claim (Michigan Sub-Class, COUNT I).

**IT IS SO ORDERED.**

s/Bernard A. Friedman
Hon. Bernard A. Friedman
Dated: March 31, 2023              Senior United States District Judge
        Detroit, Michigan

65