UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK WILLIAM DROESSER et al.,

    Plaintiffs,

v.

FORD MOTOR COMPANY,

    Defendant.

Case No. 19-12365
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF DR. BRADLEY EDGAR [149]**

---

This is a multi-state putative class action alleging that Defendant Ford Motor Company equipped many of its trucks with defective CP4 diesel fuel pumps—the component that pressurizes and injects fuel into the engine. Plaintiffs believe that their pumps failed (or will fail) due in large part to the CP4's fragile design and incompatibility with U.S. diesel fuel. To support this position, they rely on the expert opinion of Dr. Bradley Edgar, a mechanical engineering expert, that the pumps should be more robust when exposed to various fuel contaminants. After many years of extensive discovery, Ford moved for summary judgment. This filing was accompanied by a motion to exclude Dr. Edgar's report and testimony as unreliable.

This is not the first time an original equipment manufacturer (OEM) has moved to exclude Dr. Edgar's opinions about an allegedly defective Bosch CP4 fuel pump. In similar cases, a Texas district court excluded Dr. Edgar's testimony as unreliable while another judge in this District went the other way and found Edgar's

testimony to be admissible. Considering these competing cases and the particular facts of this case, the Court finds that Plaintiffs have met their burden of showing Edgar's expert opinion is sufficiently reliable. Thus, Ford's motion to exclude (ECF No. 149) is DENIED.

## I.

### A. Procedural Posture

There are several motions pending before the Court that are all impacted by Edgar's testimony: Ford's motion for summary judgment (ECF No. 147), Plaintiffs' motion for class certification (ECF No. 144), and Ford's motion to exclude Dr. Edgar (ECF No. 149). More specifically, whether certain claims survive summary judgment depends in large part on the admissibility of Edgar's opinions. And when "challenged expert testimony is material to a class certification motion" the Court must first conduct a *Daubert* analysis. *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253 (6th Cir. 2024). So the Court starts with the motion to exclude Edgar as an expert (ECF No. 149). The motion is fully and adequately briefed (ECF Nos. 166, 177) and does not require further argument. E.D. Mich. LR 7.1(f)(2).

### B. Factual Background

In this products liability case, Plaintiffs allege that hundreds of thousands of 2011–2023 Ford diesel trucks equipped with 6.7L Power Stroke diesel engines (the "Class Vehicles") contained defective high-pressure fuel injection pumps. (ECF No. 87, PageID.19523.) The pump at issue is the "CP4 pump" supplied by automotive component parts supplier Robert Bosch GmbH ("Bosch"). (*Id.*)

The fuel injection pump is an integral component of a diesel engine. (*Id.* at PageID.19524, 19580.) In ideal conditions, the pump takes in diesel fuel, pressurizes it, and delivers it to a reservoir (the fuel rail) where fuel injectors then spray it into the engine. (*Id.*; ECF No. 147, PageID.32050.) The pump passes the fuel through small, rotating metal parts that must "seamlessly roll together without skipping, sliding, sticking, or wearing to operate effectively." (ECF No. 87, PageID.19524; ECF No. 147, PageID.32050.) By design, the CP4 pump relies on the diesel fuel in the pump itself to keep these rolling parts lubricated and rolling properly. (*Id.*)

But conditions are not always ideal. (ECF No. 144-3, PageID.27862 (" . . . but if real-world conditions deviate from the ideal (as they often do) . . . .").) For example, low-quality diesel fuel may be too dry, or contaminants like water, dust, or air bubbles may get into the pump. (ECF No. 87, PageID.19524, 19615.) Or a user could operate their vehicle without adequate fuel or mistakenly fill up with regular gas instead of diesel fuel. (*Id.* at PageID.19586.) In these scenarios, contaminants find their way into the pump and the pump loses lubrication. (*Id.* at PageID.19594.) Engineers call this "low lubricity." (*See* ECF No. 144-3, PageID.27862.) And with low lubricity the rolling parts inside the pump can stick and grind together, which in turn produces metal shavings and other debris that jam the pump and cause the pump to run poorly or, even worse, to fail suddenly. (*Id.* at PageID.27859, 27877.) This necessitates repair of the pump or a replacement of the entire engine. (ECF No. 87, PageID.19595–19596; ECF No. 144, PageID.27802.)

3

At the outset of the litigation, Plaintiffs alleged that the CP4 pump was not robust enough to deal with these issues. For instance, they alleged "[a] sound and robust design would . . . make [the pump] tolerant to fuels that are commercially sold, but do not meet the proper requirements" and that the pump "should also be designed to withstand some level of foreseeable inadvertent mistreatment by the customer, *e.g.*, inadvertent misfuelling, running out of fuel, delaying a filter change, or draining the water separator." (*Id.* at PageID.19586.) They maintained that Ford knew of the pump's fragility yet still pushed these CP4-equipped vehicles onto the market. (*Id.* at PageID.19658–19680.) This is also the essence of their liability expert's opinions. "Dr. Edgar's core conclusion is that the CP4 pump is defective because it is not robust to foreseeable, real-life fuel conditions." (ECF No. 165 (Sealed), PageID.42299.)

Based on these allegations, Plaintiffs brought claims on behalf of multiple putative classes across several states for various warranty, consumer protection, fraudulent concealment, and breach of contract claims. (*Id.* at PageID.19702–20088.) While Ford has since issued a recall of diesel trucks with a CP4 pump, it vigorously contests Plaintiffs' contention that the CP4 pump is defective. (ECF No. 93.) It believes it was adequately designed and tested, and any engine failures are caused by user error and contaminated fuel—factors that Ford is not responsible for. (*Id.*)

Ford believes that, after years of discovery, it is entitled to summary judgment on Plaintiffs' claims. (ECF No. 146.) To strengthen its contention that there is no genuine issue of material fact on the issue of whether the CP4 pump is defective, Ford has moved to exclude the expert report and testimony of Dr. Edgar. (ECF No. 149.)

4

## C. Legal Standard

Expert testimony "consists of opinions or commentary grounded in 'specialized knowledge,' that is, knowledge that is 'beyond the ken of the average juror.'" *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 767 F. Supp. 3d 495, 504 (E.D. Mich. 2025) ("*In re Chrysler*") (citing *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016)).

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 was first amended in 2000 to emphasize "the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge." *In re Chrysler*, 767 F. Supp. 3d at 504 (citing *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993)). It was amended again in 2023 "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the

admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. It reminded courts that "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.*

The heart of Rule 702 is that expert testimony must be based on "reliable principles and methods" and must have been "reliably applied" in the case. *Martin v. Polaris, Inc.*, No. 24-5852, 2025 WL 3094123, at *4 (6th Cir. Nov. 4, 2025) (citing *Gissantaner*, 990 F.3d at 463 (quoting Fed. R. Evid. 702)). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Chrysler*, 767 F. Supp. 3d at 504 (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008)). At bottom, Rule 702 "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

At the same time, "nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support." *Id.* And "mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *In re Chrysler Pacifica*, 767 F. Supp. 3d at 505 (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)). There must simply be "some

support for those facts in the record." *Id.* (citing *In re Kirvan*, No. 21-1250, 2021 WL 4963363, at \*5 (6th Cir. Oct. 26, 2021)).

For these reasons, reliability is a "'flexible' question, and the district court has 'broad latitude' in both its method of inquiry and its 'ultimate reliability determination.'" *Martin*, 2025 WL 3094123, at \*4 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999)); *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) ("District courts have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'") (citing *Kumho Tire*, 526 U.S. at 152).

## II.

Bradley Edgar is Plaintiffs' main expert regarding the CP4 pump. He holds a PhD in mechanical engineering and is the head of a consulting group specializing in "power train engine and emissions-related matters." (ECF No. 144-3, PageID.27863.) Edgar physically inspected multiple CP4 diesel fuel pumps, including two class representative vehicles (*id.* at PageID.27865), and also reviewed several secondary sources (*id.* at PageID.28034 (Appendix L: List of Materials Considered)). Based on his analysis, Edgar opines that the CP4 pump used in the Class Vehicles "is defectively fragile, making it incompatible with US market fuel." (ECF No. 144-2, PageID.27836.) He believes the pump is not "robust" enough to reasonably foreseeable real-world fuel contamination conditions. (ECF No. 144-3, PageID.27862–27863.) And that it should have been designed to "anticipate expected real-world experiences of the vehicles and to develop measures to mitigate potentially adverse

impacts." (*Id.* at PageID.27925.) He further opines that this fragile design causes wear and tear, which can generate metal shavings that make class vehicles prone to catastrophic failure and loss of power. (*Id.* at PageID.27859.)

Key to Edgar's opinion is the unusually high "failure rate" of the pump, based on the large number of replacement pumps Bosch sold to Ford during the relevant time frame. (*Id.* at PageID.27859.) Edgar believes Ford knew or should have known that the CP4 pump was defective. He notes that there was ample data available to Ford, other manufacturers, and the public, that showed CP4 pumps were failing at an unusual rate. (*Id.* at PageID.27919–27922.)

Ford takes issue with several factual assumptions and the methodology employed in Edgar's expert report. (ECF No. 149, PageID.37047.) In addressing these arguments, the Court need not start from scratch. The parties have advised that Edgar's testimony has recently been challenged in two other federal cases involving similar causes of action and defect allegations.

Ford relies on *Stevens v. Ford Motor Co.*, No. 18-00456, 2022 WL 19978265 (S.D. Tex. Sept. 29, 2022), in which the court excluded Edgar's opinions about the CP4 pump's alleged deficiencies on several of the same grounds that Ford raises in this motion. More specifically, the *Stevens* court concluded that Edgar "conducted no independent testing of the CP4 pump," "did not inspect or investigate Plaintiffs' Class Vehicles," "provide[d] no comparative analysis" of the CP4 pump and its CP3 predecessor, and "fail[ed] to sufficiently address alternative theories that could

undermine his own theory" such as "contamination, [driver] abuse, misfuelling, or failure to maintain." *Id.* at *4–7.

On the other hand, Plaintiffs rely on *Chapman v. Gen. Motors LLC*, No. 19-12333, 2023 WL 2745161 (E.D. Mich. Mar. 31, 2023), another case assessing the reliability of Edgar's expert opinions about the Bosch CP4 pump (which is also used in GM vehicles). The *Chapman* court denied GM's motion to exclude, finding Edgar's methodology and assumptions to be reasonable and well-founded. *See id.* at *5–7. That court was "not persuaded by the reasoning in *Stevens*" that Edgar did not conduct sufficient testing, examination, or safety analysis of the CP4 pumps. *Id.* at *5.

In short, Ford asks this Court to side with *Stevens* and exclude Edgar as an expert while Plaintiffs ask the Court to side with *Chapman* and permit Edgar as an expert. After reviewing both cases, other applicable law, and the particular facts of this case, this Court agrees with the ruling in *Chapman*, and for those same reasons finds Edgar's report sufficiently reliable under Rule 702.

## A. Failure Rate

To calculate the failure rate of the CP4 pump, Edgar points to the sale of Bosch replacement pumps based on the reasonable assumption that pumps are purchased to replace faulty pumps. (ECF No. 144-3, PageID.27859.) He believes pump replacement sales are a proxy for pump failure, explaining, "I am not aware of any reason to replace a CP4 pump other than to mitigate a failed pump; therefore I

9

assume each replacement pump Bosch sold to the Ford Service channel represents a failed pump." (*Id.* at PageID.27911.)

Ford contends this is an unreliable conclusion. (ECF No. 149, PageID.37064–37065.) GM made a similar argument in *Chapman. Chapman*, 2023 WL 2745161, at *6 ("GM argues that Dr. Edgar's use of replacement pump sales as a proxy for pump failures renders his calculations unreliable because it wrongly assumes that every sale reflects a failure under Plaintiffs' defect theory."). First, says Ford, pumps are frequently misdiagnosed as "failed." It points to an eight-year study from Bosch showing that around 50% of all pumps returned were found to be in working order. (ECF No. 177, PageID.45772.) Second, Ford says replacement pumps could be sold because a pump was incorrectly installed and requires re-installation. And third, a pump could have failed and required replacement for a reason *other than* low lubricity. (ECF No. 149, PageID.37065.)

To support its argument that the pump replacement sales do not equal the pump failure rate, Ford cites to *Kondash v. Kia Motors Am., Inc.,* 347 F.R.D. 197, 2020 WL 5816228, at *1–2 (S.D. Ohio Sept. 30, 2020). (*Id.* at PageID.37070.) In rejecting this same argument made by GM, the *Chapman* court aptly explained:

> In *Kondash*, the specific component at issue was a panoramic sunroof, comprised of three panels. The expert calculated the sunroof failure rate based on sales of individual replacement panels, without regard for whether one, two, or three panels were required to repair the sunroof of a class vehicle. In addition to potentially double or triple counting the number of sunroof failures, the expert's calculations made no effort to account for sunroof repairs unrelated to defective design, such as leaking, wind, or car crashes. In excluding that expert's report and opinions, the court noted that there was also evidence that the expert

had ignored calculation methods that were more widely accepted in the industry.

. . .

GM's criticisms of Dr. Edgar's calculations do not expose a defect in reliability so grave as the potential double or triple counting component failures in *Kondash*. As Plaintiffs noted during argument, here there is only one replacement component that provides the basis for Dr. Edgar's calculation—*i.e.*, one replacement pump per pump failure, rather than one to three panels per defective sunroof. To be sure, Dr. Edgar's calculations do not readily account for pump failures unrelated to the alleged design defect (such as customer negligence). He simply assumes that such failures are "de minimis." The correctness of these assumptions goes towards the weight of Dr. Edgar's calculations, however, not their admissibility. "Disputes about the accuracy of a theory's results, generally speaking, provide grist for adversarial examination, not grounds for exclusion."

*Chapman*, 2023 WL 2745161, at \*6 (internal citations omitted).

The court in *Chapman* also did not find a purported 30% misdiagnosis rate to render Edgar's failure rate analysis unreliable. *Id.* The same reasoning applies here.

In other words, the Court understands Ford's position that replacement pump sales are not a perfect measure of the pump failure rate. But the Court will not exclude Edgar's testimony "merely because the factual bases for an expert's opinion are weak." *Strougo v. Tivity Health, Inc.*, No. 20-00165, 2025 WL 1415896, at \*3 (M.D. Tenn. May 15, 2025) (citing *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012)). Rule 702 does not "require anything approaching absolute certainty." *Id.* (citing *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)). Instead, Edgar's opinion that sales of replacement pumps fairly identify the pump's failure rate must only have "a reasonable basis in fact." *Metro. Design & Dev., LLC v. Frankenmuth Mut. Ins. Co.*, No. 25-38, 2026 WL 1162583, at \*5 (S.D. Ohio Apr. 29,

11

2026) (citing *Hulsing Enters., LLC v. Fazio Mech. Servs.*, No. 21-1536, 2025 WL 2960178, at \*3 (N.D. Ohio Oct. 19, 2025)).

And it does. For one, Edgar explained that the pumps are expected to last for the life of the vehicle. (ECF No. 144-3, PageID.27863 ("The CP4 pump was intended to last for [redacted] miles when used with US Market fuel and under real world conditions. It was not designed to be replaced or serviced in mid-life. Therefore, it is reasonable to assume the most likely reason for Bosch to sell a replacement pump is for the purpose of replacing a failed pump.").) He also considered the failure rate of the CP4 over the lifetime of the vehicles. While most parts follow a "bathtub curve" with failures peaking at the beginning and the end of the car's life and remaining relatively stable in the middle, Edgar noticed an inverse of the bathtub curve for CP4-equipped Class Vehicles. (*Id.* at PageID.27916.) He noticed pump replacements occurred "at any mileage" and increased over a vehicle's lifetime, thus suggesting "an incompatibility with real world conditions . . . ." (*Id.* at PageID.27917.) As for the misdiagnosis rate, he believes it is de minimis. (ECF No. 166-5, PageID.42601.) And he explained the ways in which the replacement sales metric is a conservative measure that likely undercounts pump failures. (ECF No. 144-2, PageID.27845 ("It is important to note that total pump replacements are far greater than warranty events highlighting my previous analysis that warranty data grossly underreports the actual failure rate.").) Finally, Plaintiffs argue that even Ford's own engineers look to pump sales as a proxy for pump failures. (ECF No. 166, PageID.42395.)

12

In sum, Edgar's reliance on pump replacement sales as a reliable proxy for pump failure is not a basis for excluding his opinion about the lack of adequate robustness of the CP4 fuel pump. Instead, Ford's critiques of the theory are fair game for "adversarial examination." *Chapman*, 2023 WL 2745161, at *6 (citing *Gissantaner*, 990 F.3d at 464).

## B. Causality

Even assuming that replacement pump sales approximate the pump failure rate, *i.e.*, that pumps are replaced because they failed, Ford challenges Edgar's conclusion that those pumps failed *because of* a defect. (ECF No. 149, PageID.37066.) Ford says Edgar did not review the dealership repair records to "determine what percentage of pump repairs were caused by customer abuse." (*Id.* at PageID.37067.)

This is not a basis for exclusion either. In his expert report, Edgar confirmed that he did consider customer abuse. (ECF No. 144-2, PageID.27900 ("Specifically, I have considered readily foreseeable circumstances such as variability in fuel specification and quality, as well as operator abuse/neglect. I developed plans to address and mitigate these impacts.").) He was also asked in his deposition about instances of customer abuse that could cause pump failure, such as ignoring the "water in fuel" warning light "until the water separator overflows and passes on water to the fuel system." (ECF No. 166-5, PageID.42558 (Edgar deposition testimony).) He responded that he found such a scenario to be "an extreme case[.]" (*Id.*) While he noted that it would be "advantageous" for Ford to design against such instances of extreme customer abuse, his theory is that Ford has not designed against ordinary

13

instances of customer abuse. (*Id.* at PageID.42558, 42602 ("the defect is that the design has a very narrow range of boundary conditions and that failures are associated when the fuel falls outside of those boundary conditions.").) He explained that "[w]hile it may not be possible to eliminate the impacts of non-specification fuel, or operator abuse/neglect, a small mistake should not lead to costly repairs that can meet or exceed at least [redacted] per repair." (ECF No. 144-3, PageID.27926.) So having considered the performance data, failure rates, and expected consumer behavior, Edgar still believes that the pump was too prone to failure in instances of ordinary, not extreme, cases of customer abuse. He provided a reliable basis for this opinion.

In a similar vein, Ford argues that Edgar did not conduct enough independent testing of the Class Vehicles to determine the true prevalence and cause of the alleged pump failures. (ECF No. 149, PageID.37067 ("Dr. Edgar likewise made little effort to learn anything about the named Plaintiffs' vehicles here.").) The *Stevens* court excluded Edgar's testimony, in part, on this ground. *Stevens*, 2022 WL 19978265, at *4 ("Putting aside Dr. Edgar's lack of inspection or investigation into Plaintiffs' Class Vehicles, it is also problematic that Dr. Edgar conducted no independent testing of the CP4 pump. Dr. Edgar asserts that no independent testing is required in this case."). Edgar, however, inspected the vehicles of two class representatives and wrote a report on each (ECF No. 144-3, PageID.27865), a fact the court in *Stevens* did not credit. Compare *Stevens*, 2022 WL 19978265, at *4 ("But Dr. Edgar did not incorporate any such inspections into his report, nor did he inspect or investigate

14

Plaintiffs' Class Vehicles, the genesis for this lawsuit."), with *Chapman*, 2023 WL 2745161, at *5 ("While Dr. Edgar did not personally remove a CP4 pump from a class vehicle, he inspected the vehicles and also conducted teardowns of two CP4 pumps, which involved dismantling them and inspecting their key drive train components. He then reviewed reports and photos of other failed pumps and compared them to the ones he personally tore down.").

As the *Chapman* court recognized, while "lack of testing is often a 'red flag' that weighs against the admissibility of an expert's opinion, [t]here is no per se requirement that an expert conduct his or her own testing." *Chapman*, 2023 WL 2745161, at *5 (cleaned up). That is because "[d]eductive reasoning and critical review of existing test data can be a reasonable and reliable method of analysis, especially where (as here) extensive data on the precise question [the expert] was asked to consider had already been collected." *Id.*

And as he did in *Chapman*, Edgar critically reviewed the plethora of existing testing data on the CP4 pump from Ford, other automotive manufacturers, and the National Highway Traffic Safety Administration. (*See, e.g.*, ECF No. 144-3, PageID.27920.) This Court agrees with *Chapman* that Edgar's analysis of this existing data was a sufficiently reliable methodology to support his conclusions of causality. *Chapman*, 2023 WL 2745161, at *5; *see also Strougo*, 2025 WL 1415896, at *3 ("Under *Daubert*, experts are 'permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable

15

basis in the knowledge and experience of the discipline.'") (quoting *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 445 (6th Cir. 2012)).

Accordingly, the Court will not exclude Edgar's testimony on this ground.

### D. Comparative Analysis

Ford's next critique is that "[Dr. Edgar] posits that the CP3 or other pumps would perform better than the CP4 but provides no data or testing to substantiate his claims and admits he lacks information showing any other pumps would withstand gasoline or DEF misfill." (ECF No. 177, PageID.45770.)

According to Edgar's testimony, however, he "studied other contemporary high-pressure diesel fuel-lubricated common rail pumps including the Bosch CP3 (the previous generation to the CP4), the Denso HP4, and the Stanadyne DCR. In contrast to the CP4 design, all of these pump designs use a different mechanism called an "eccentric cam with sliding foot." (ECF No. 144-2, PageID.27877.) And, testified Edgar, "[t]he key advantage of an eccentric cam/sliding foot design is that it is less susceptible to excessive wear with low lubricity/low viscosity fuels because it does not rely on a hydrodynamic boundary layer to prevent metal-to-metal wear." (*Id.*) This provides a reasonable basis for his conclusion that the previous models of the Bosch pump had more robust designs.

### E. No Standard for Robustness

Lastly, Ford is correct that Edgar "developed no standard by which to assess the robustness of a high-pressure diesel pump to gasoline misfuelling beyond the

16

testing Bosch performed to prove out the CP4 pump used in Class Vehicles to such abuse." (ECF No. 149, PageID.37069.)

But this does not preclude him from opining, based on his extensive analysis of the CP4 pump's performance and consideration of the performance and susceptibilities of other pumps, that the CP4 pump in the Class Vehicles was not sufficiently robust to real world conditions. In other words, he does not need to determine a standard to opine that one misfuelling with gasoline should not cause the entire engine to fail and necessitate a costly repair. (ECF No. 144-3, PageID.27926.)

In sum, while Ford has strong bases on which to challenge Edgar's opinion that the CP4 pump in the Class Vehicles is defective, they do not warrant the wholesale exclusion of Edgar's testimony under Federal Rule of Evidence 702.

### C. Rule 702 Amendments

Ford makes a few final points in its effort to persuade the Court to follow the ruling in *Stevens* and not *Chapman.*

First, the timing of the opinions is such that *Chapman* was decided before the recent amendments to FRE 702. (ECF No. 149, PageID.37073.) But this does not alter the Court's position. The 2023 amendments simply reinforced the importance of the Court's gate-keeping function. They reminded the trial courts that a party must show that it is more likely than not that an expert's opinion is reliable. The amendments did not break new ground or substantively change the rule. *Lyman v. Ford Motor Co.*, No. 21-10024, 2026 WL 1469885, at *3–4 (E.D. Mich. May 26, 2026) ("Accordingly,

17

courts have consistently recognized that the amendment did not substantively change Rule 702's requirements") (collecting cases); *Costello v. Mountain Laurel Assurance Co.*, No. 22-35, 2024 WL 239849, at *4 (E.D. Tenn. Jan. 22, 2024) ("the Court recognizes that these amendments were intended to clarify the requirements of the Rule, not to make substantive changes.")

The *Chapman* court faithfully applied Rule 702. It assessed the reasonable basis for Edgar's opinion and reliability of his methodology, highlighting both their strengths and weaknesses. *Chapman*, 2023 WL 2745161, at *6. It concluded that Edgar's opinion was not based on mere speculation but instead on rigorous review of data, secondary sources, and his own investigation. *Id.* at *5–6. It also recognized that the defendant had valid critiques of Edgar's report and the factual assumptions within it. It ultimately found that "[t]he correctness of these assumptions g[o] towards the weight of Edgar's calculations, . . . not their admissibility." *Id.* at *6. This remains a proper analysis under the 2023 amendments to Rule 702 and one the Court can still rely on today.

Second, Ford points out that *Chapman* involved different vehicles with an already lower-performing engine system. (ECF No. 149, PageID.37073.) But it is unclear how the vehicles' differences outweigh the similarities and use of an identical fuel pump supplied by the same manufacturer.

For these additional reasons, the Court is going to follow the lead of *Chapman* and not exclude the report or testimony of Dr. Edgar.

**III.**

Thus, Ford's motion to exclude Dr. Edgar (ECF No. 149) is DENIED.[1]

IT IS SO ORDERED.

Dated: July 28, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

---

[1] Accordingly, the sealed version of the motion (ECF No. 148) is also denied.

19