UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK WILLIAM DROESSER et al.,

Plaintiffs,

v.

FORD MOTOR COMPANY,

Defendant.

Case No. 19-12365
Honorable Laurie J. Michelson

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL [144]**

This is a putative class action in which plaintiffs Curtis McNeal Mertz, Joseph Sawicki, Sonja Bauers, Joey Angona, Jeffrey A. Ford, Jay Eriv, Matthew Parker, Trevor Wentz, and Keith Williams (collectively, "Plaintiffs") allege that defendant Ford Motor Company ("Ford") caused them out-of-pocket losses because of a fuel pump defect in certain Ford's diesel trucks. Presently before the Court is Plaintiffs' motion for class certification and appointment of class representatives and class counsel (ECF No. 144). The parties have submitted extensive written briefs explaining their positions on whether class certification is appropriate. (ECF Nos. 144, 143 (Sealed), 163, 162 (Sealed), 179, 190, 191.) The Court conducted a limited hearing on September 28, 2026, to clarify a few points. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for class certification (ECF No. 144).

## I. Procedural History

On August 9, 2019, Plaintiffs filed this putative class action case alleging the "Class Vehicles"—Ford Trucks purchased between 2011–present and equipped with the 6.7 Power Stroke diesel engines—contained defective high-pressure fuel pumps. (ECF No. 1.) After several amended complaints, Plaintiffs filed the operative pleading, the Third Amended and Consolidated Class Action Complaint ("TAC") on April 28, 2023. (ECF No. 87.)

In November 2025, following extensive discovery, the parties filed three motions. Ford filed a motion to exclude the expert testimony of Plaintiffs' defect expert, Dr. Bradley Edgar (ECF No. 149), which the Court denied, finding Dr. Edgar's testimony sufficiently reliable (ECF No. 195). Ford filed a motion for summary judgment on all claims, (ECF No. 147), which the Court will be ruling on shortly. And Plaintiffs filed a motion for class certification—the subject of this opinion—asking the Court to certify seven state-specific classes under Federal Rule of Civil Procedure 23(a) and 23(b)(3) for claims of breach of the implied warranty of merchantability and violation of California consumer protection laws. (ECF No. 144.)

## II. Factual Background

Diesel vehicles are known for their fuel efficiency, mileage longevity, and engine power. (ECF No. 87, PageID.19579–19580.) Indeed, customers pay a premium for these very reasons. (*Id.*) Diesel vehicles achieve these benefits through their fuel injection systems, a key component of which is the high-pressure fuel pump.

This case involves 2011–2023 Ford diesel trucks equipped with 6.7L Power Stroke diesel engines (the "Class Vehicles"). (ECF No. 87, PageID.19523.) Plaintiffs allege that the high pressure fuel pump in the Class Vehicles, the "CP4 pump" supplied by automotive component parts supplier Robert Bosch GmbH ("Bosch"), is defective. (ECF No. 146, PageID.29033 (Sealed).)

The CP4 pump, diagram below, includes an engine-driven camshaft and pumping cylinders with camshaft-driven plungers, and uses a cam to convert rotation of the camshaft into up and down movement of the plungers. (*See* ECF No. 87, PageID.19585–19599.) When connected to the diesel engine, the diesel engine rotates the camshaft, the camshaft rotates the cam, and the cam lifts the plungers for pressurizing strokes. (*Id.*) Plaintiffs focus on the cam, and for each pumping cylinder, the mechanism between the cam and the plunger. (*Id.*) The CP4 pump includes a two-lobe cam, a roller parallel to the camshaft, and a tappet with a roller shoe in the pumping cylinder. (*Id.*) As the cam rotates, the roller rotates between the camshaft and the tappet by rolling along the cam and rotating inside the roller shoe. (*Id.*)




(*Id.*)

Key to the pump's design is that it uses diesel fuel to lubricate and cool the component parts. (*Id.* at PageID.19524 (The pump passes the fuel through small, rotating metal parts that must "seamlessly roll together without skipping, sliding, sticking, or wearing to operate effectively.").) Fuel also circulates to the pump's cylinder heads where pistons pressurize it and push it into the high-pressure fuel pipes. (*Id.* at PageID.19581–19582.) From there, the fuel flows to a reservoir (the fuel rail) where fuel injectors spray it into the engine. (*Id.*) Some of this fuel is not needed to power the engine so it flows out of the pump and goes back to the vehicle fuel tank. (*Id.*)

Here is the trouble: Plaintiffs allege that when the cam-roller-tappet mechanism is not sufficiently lubricated, the component parts grind instead of glide, and create small metal shavings. (*Id.* at PageID.19523–19524, 19590.) Wear is exacerbated by the high contact stresses between the cylinder-shaped parts. (*Id.*, PageID.19590–19591.) When these metal shavings make their way into the engine, it can cause catastrophic engine failure, necessitating a $9,000 repair. (ECF No. 179, PageID.45994.)

Plaintiffs allege that this risk of low lubricity is entirely foreseeable and especially concerning in light of U.S. diesel fuel quality. (ECF No. 87, PageID.19601.) Compared to European diesel fuel, U.S. diesel fuel is "cleaner" but "dry" and less "lubricious." (*Id.* at PageID.19524, 19527.) For diesel fuel, lubricity is quantified in "wear scar," a shorthand way of referring to the diameter of scratches that a sample allows during testing. (*Id.*) The larger the wear scar, the lower the lubricity. (*Id.*) To

meet the European standard, diesel fuel must have a maximum lubricity of 460 wear scar, but to meet the U.S. standard, the diesel fuel upper limit is higher, permitting a wear scar as high as 520. (*Id.* at PageID.19602.)

The parties have also explored other ways that contaminants can enter the fuel system, such as customer abuse/mistreatment of the vehicle. This includes filling up the tank with non-diesel fuel entirely, or using a fuel additive with contaminants like emulsifiers that bring water into the engine. (*Id.* at PageID.19586.)

The low-pressure pump has mechanisms designed to deal with these nonideal conditions. For example, the low-pressure pump is meant to separate out water from the fuel, and, when this happens, drivers receive a Water in Fuel (WIF) dashboard alert prompting them to drain the water by turning a valve on the fuel system. (ECF No. 147, PageID.32048.) But if the user fails to do so, this could contribute to water getting through to the high-pressure pump. As for particles, there is a secondary fuel filter that is intended to filter out contaminants before the fuel enters the high-pressure pump. (ECF No. 147, PageID.32049; ECF No. 168, PageID.43588.) And if contaminated fuel is detected, drivers receive an alert and the engine's power output is reduced. (ECF No. 147, PageID.32049, ECF No. 168, PageID.43589.) But if filters are not regularly cleaned out, contaminants could pass through.

Plaintiffs allege the CP4 pump was not robust enough to deal with these non-ideal conditions. This is also the essence of Dr. Bradley Edgar, their liability (or defect) expert's opinions. (*See* ECF No. 149-1 (Edgar Report; ECF No. 143-2,

PageID.26615 (Edgar Suppl. Report) (Sealed); ECF No. 195 (finding Edgar report admissible).)

Based on these allegations, Plaintiffs brought claims on behalf of multiple putative classes across several states for various warranty, consumer protection, fraudulent concealment, and breach of contract claims. (*See generally* ECF No. 87.)

## III. Class Certification

### A. Proposed Classes

In their motion for class certification, Plaintiffs seek certification of the following seven state-specific classes under Federal Rule of Civil Procedure 23(a) and Federal Rule of Civil Procedure 23(b)(3) for claims of breach of the implied warranty of merchantability under the applicable state law:

> 1. California Class. All persons or entities who purchased one or more of the Class Vehicles in California and have paid, or will have paid, out of pocket for a CP4 repair.
>
> 2. Indiana Class. All persons or entities who purchased one or more of the Class Vehicles in Indiana and have paid, or will have paid, out of pocket for a CP4 repair.
>
> 3. Louisiana Class. All persons or entities who purchased one or more of the Class Vehicles in Louisiana and have paid, or will have paid, out of pocket for a CP4 repair.
>
> 4. New Jersey Class. All persons or entities who purchased one or more of the Class Vehicles in New Jersey and have paid, or will have paid, out of pocket for a CP4 repair.
>
> 5. Ohio Class. All persons or entities who purchased one or more of the Class Vehicles in Ohio and have paid, or will have paid, out of pocket for a CP4 repair.
>
> 6. Pennsylvania Class. All persons or entities who purchased one or more of the Class Vehicles in Pennsylvania and have paid, or will have paid, out of pocket for a CP4 repair.

> 7. South Carolina Class. All persons or entities who purchased one or more of the Class Vehicles in South Carolina and have paid, or will have paid, out of pocket for a CP4 repair.

(ECF No. 144, PageID.27781–27782.)

With respect to the proposed California class, Plaintiffs additionally seek certification for two claims of violation of consumer protection law. (*Id.* at PageID.27797.)

Plaintiffs further seek appointment of the following named Plaintiffs as class representatives for the proposed classes: (1) Curtis McNeal Mertz and Joseph Sawicki (California); (2) Sonja Bauers (Indiana); (3) Joey Angona and Jeffrey A. Ford (Louisiana); (4) Jay Eriv (New Jersey); (5) Matthew Parker (Ohio); (6) Trevor Wentz (Pennsylvania); and (7) Keith Williams (South Carolina). (*Id.* at PageID.27782.)

Plaintiffs also propose the law firms of (i) Hagens Berman Sobol Shapiro LLP, (ii) Hilliard Law, and (iii) The Miller Law Firm P.C. to serve as class counsel. (*Id.*)

## IV. Preliminary Matters

### A. Standing

As a threshold matter, Ford argues that the proposed class cannot be certified because it embraces an overwhelming number of class members who have not experienced a fuel pump failure and thus have no injury in fact that could support standing. (ECF No. 163, PageID.40333–40337.)

Article III of the United States Constitution limits the jurisdiction of federal courts to discrete "cases and controversies." U.S. Const. art. III, § 2, cl.1. This jurisdictional limitation is operationalized, in part, through the doctrine of standing. To have Article III standing, "a plaintiff must show (i) that he suffered an injury in

fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). The plaintiffs, as the party invoking federal jurisdiction, have the burden of demonstrating all three of injury in fact, causation, and redressability. *Lujan*, 504 U.S. at 561.

At issue in this case is whether Plaintiffs who have not experienced a fuel pump failure suffered an injury in fact. (ECF No. 163, PageID.40335; ECF No. 179, PageID.45988.) In a suit for damages such as this one, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm." *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357, 361 (6th Cir. 2021) (quoting *TransUnion LLC*, 594 U.S. at 415). Instead, plaintiffs must demonstrate that the "the risk of future harm materialized," or that they "were independently harmed by their exposure to the risk itself." *See TransUnion LLC*, 594 U.S. at 415 (concluding plaintiffs whose credit information had not been disclosed did not establish standing in credit reporting case). In a suit for injunctive relief, plaintiffs must show that the threat of future injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

Ford argues that the putative class members who have not experienced pump failure face "only the risk of *future* harm[,]" not a presently materialized harm. (ECF No. 163, PageID.40335 (alterations in original).) In an effort to avoid this conclusion, Plaintiffs cite *Roman v. Korson*, 152 F.R.D. 101, 110–11 (W.D. Mich. 1993) where the

district court certified a class that included future migrant farm workers to protect them against continuing minimum wage and health and safety violations. But that case certified a Rule 23(b)(2) injunction class, expressly rejecting the grounds for a Rule 23(b)(3) damages class. *Id.* Ford has the better of the argument—the potential class members with only the risk of future pump failure have no presently materialized injury.

Nor have they been independently harmed by the future risk. Plaintiffs previously plead an "overpayment" theory, claiming that "future repair" plaintiffs were still harmed because, had Ford disclosed the alleged defect, they would not have purchased Class Vehicles or would have paid less for them. (ECF No. 85, PageID.19435). But Plaintiffs' damages expert offers only a cost-of-repair model to calculate damages, not an overpayment (or benefit-of-the-bargain) model. (*See* ECF No. 163, PageID.40337). So they failed to bring forward the "manner and degree of evidence" needed to establish this theory. *See Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."); *Nat'l Wildlife Fed'n v. Sec'y of United States Dep't of Transportation*, 286 F. Supp. 3d 836, 841 (E.D. Mich. 2017) ("the factual predicates of all aspects of standing must be established by the plaintiff through proper evidence of specific facts."). Thus, Plaintiffs have forfeited this argument. (*See* ECF No. 179, PageID.45988.)

Finally, even if Plaintiffs sought a class-wide injunction, the threat of future injury is not "certainly impending" as Plaintiffs' technical expert estimates that the

majority of Class Vehicles will never suffer a pump failure. (ECF No. 163, PageID.40336.)

Thus, putative class members who have not yet experienced a pump failure lack standing.

Because the vast majority of the putative class included these individuals, Ford says this dooms the entire class. (ECF No. 163, PageID.40334 (citing *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 987 (8th Cir. 2021) ("[A] class cannot be certified if it contains members who lack standing."); *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 346 (6th Cir. 2025) (Nalbandian, J. concurring) ("[A] class cannot be certified with members who have not suffered an injury in fact"); *See also Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 332 (2025) (Kavanaugh, J., dissenting from dismissal of certiorari as improvidently granted) ("I would hold that federal courts may not certify a damages class pursuant to Rule 23 when the class includes both injured and uninjured class members."). Plaintiffs, on the other hand, say this goes to the breadth of the proposed class, not whether any class can be certified at all. Invoking the Court's "unbridled" discretion, Plaintiffs invite the Court to certify a class "in any manner it sees fit." (ECF No. 179, PageID.45988.)

The Court takes Plaintiffs up on that invitation and exercises its "broad discretion to modify class definitions . . . ." *See In re Flint Water Cases*, 558 F. Supp. 3d 459, 486 (E.D. Mich. 2021); *Ball v. Kasich*, 307 F. Supp. 3d 701, 718 (S.D. Ohio 2018) ("[A] district court's *sua sponte* amendment 'show[s] that the court took seriously its obligation to make appropriate adjustments to the class definition as the

litigation progressed.'") (granting in part and denying in part motion for class certification). Accordingly, potential class members with no pump failure are excluded from the class definition.

**B. Class Action Waiver**

Next, Ford argues that a warranty booklet class action waiver to which all Plaintiffs agreed leaves the proposed Indiana, Louisiana, New Jersey, Ohio, Pennsylvania, and South Carolina classes without any representatives. Because Ford seeks an outcome that would preclude class certification for all states but California, the Court will consider Ford's class action waiver argument out of turn.

In support of its argument, Ford points to the warranty booklets for Class Vehicles. The warranty booklets set forth the terms of Ford's New Vehicle Limited Warranty ("NVLW"). In the section on limitations and disclaimers, the NVLW contains a class action waiver. As stated in the MY2011 warranty booklet, whose language is representative: "You may not bring any warranty-related claim as a class representative, a private attorney general, a member of a class of claimants or in any other representative capacity." (ECF No. 163-25, PageID.41290.)

Such adhesion contract class waivers are generally enforceable. *See Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013) (upholding contractual waiver of class arbitration for claims under federal antitrust laws). Though it depends on the specific state law. California, for example, considers such class action waivers in consumer contracts of adhesion to be unconscionable. *See Rathmann v. Ford Motor Co.*, No. 21-00610, 2023 U.S. Dist. LEXIS 150136, at *6–7 (W.D. Tex. Aug. 25, 2023).

In short, that enforceability is generally context-specific and analyzed on a state-by-state basis gives the Court some pause about accepting the blanket proposition that the class action waiver is enforceable.

The Court, however, need not reach the issue of enforceability because, as Plaintiffs point out, Ford did not raise this argument until over six years into the case, all while years of class action discovery were underway. Courts infer intent to waive a right when a party has "knowledge of [the right's] existence," and acts "inconsistent with any reliance" on that right. *In Re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 143 F.4th 718, 723–24 (6th Cir. 2025) (internal citations omitted). Ford clearly knew the right existed. And it had the opportunity to raise this issue before Plaintiffs filed their class certification motion. *Glass v. Tradesmen Int'l, LLC*, 505 F. Supp. 3d 747, 764 (N.D. Ohio 2020) ("Either party may freely move for resolution of the class-certification question at any stage of the proceedings, and the class action allegations may be stricken prior to a motion for class certification where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met."); *Shoemo-Flint v. Cedar Fair, L.P.*, No. 22-1113, 2023 WL 4235541, at *1 (N.D. Ohio June 28, 2023). But Ford failed to do so. (*See, e.g.*, ECF No. 93 (No mention of waiver in Ford's Answer to Plaintiffs' TAC).) So considering Ford engaged in six years of costly class action discovery before raising the class waiver issue, the Court finds Ford has forfeited this issue.

## V. Rule 23

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation omitted). The parties seeking class certification bear the burden of not simply pleading, but proving that the requirements for class certification are met. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014); *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). Thus, before certifying a class, the Court must "probe behind the pleadings" and conduct a "rigorous analysis" to ensure that the class satisfies the Rule 23 standards. *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 316 (6th Cir. 2025) (*en banc*) (quoting *Dukes*, 564 U.S. at 350–51).

Under Rule 23(a), a potential class must demonstrate (1) numerosity, (2) commonality of facts and law, (3) typicality between the class claims and those of the named parties, and (4) adequacy of the representation by the named parties and class counsel. Fed. R. Civ. P. 23(a); *see Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976). The putative class must also meet one of the conditions in Rule 23(b) to confirm that a class action is more appropriate than multiple separate actions. Fed. R. Civ. P. 23(b); *Coleman v. Gen. Motors Acceptance Corp.,* 296 F.3d 443, 446 (6th Cir. 2002). Here, the putative class seeks certification under the third condition in Rule 23(b) (ECF No. 144, PageID.27781), which instructs the Court to balance whether "the questions of law or fact common to class members predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

And the Sixth Circuit is among those that reads an implied "ascertainability" requirement in Rule 23(b)(3), *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016), meaning the class definition must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012); *see also In re OnStar Cont. Litig.*, 278 F.R.D. 352, 373 (E.D. Mich. 2011) ("[A] class definition should be based on objective criteria so that class members may be identified without individualized fact finding.").

Ford contests the commonality and adequacy prongs of Rule 23(a) and the predominance and superiority requirements of Rule 23(b). So those are the issues the Court will address.

### A. Applicable State Law

Per the Sixth Circuit, Rule 23 requires a district court to conduct "a structured two-step approach to assess commonality and predominance." *Speerly*, 143 F.4th at 316. In doing so, a district court must "step through each element of each claim for each state" and conduct "an element-by-element commonality analysis" and "a claim-by-claim comparison of the common and non-common questions." *Id.* at 319–20, 329. To aide in this analysis, the Court will start with the applicable state law on the claims for which Plaintiffs seek certification.

### 1. Implied Warranty Claims

With respect to the proposed California, Indiana, Louisiana, New Jersey, Ohio, Pennsylvania, and South Carolina classes, Plaintiffs seek certification for the claim of breach of the implied warranty of merchantability under the applicable state law.

### California

For the proposed California class, Plaintiffs seek certification for a claim of breach of the implied warranty of merchantability under the Song-Beverly Consumer Warranty Act ("Song-Beverly Act"), Cal. Civ. Code §§ 1790–1795.8.[1]

The Song-Beverly Act provides that "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." Cal. Civ. Code § 1792. The elements of a claim of breach of the implied warranty of merchantability are: (1) lack of merchantability, *i.e.*, breach; (2) causation; and (3) damages. *Carver v. Volkswagen Grp. of Am., Inc.*, 328 Cal. Rptr. 3d 527, 546 (Cal. Ct. App. 2024) (citing *Gutierrez v. CarMax Auto Superstores Cal.*, 248 Cal. Rptr. 3d 61, 74 (Cal. Ct. App. 2018) ("In generic terms, the elements of any cause of action are wrongdoing, causation and harm.")). An "implied warranty that goods are merchantable" means that "the consumer goods meet," among other requirements, the core test of being "fit

[1] The Court will disregard Plaintiffs' passing reference to a claim of breach of the implied warranty of merchantability under the California UCC, Cal. Com. Code §§ 2101–2801. ECF No. 144, PageID.27815–27816 ("The elements of California implied warranty claims (under the Song-Beverly Act, which encompasses the requirements under California's Commercial Code) are: … ."). At the pleadings stage, the Court dismissed the California UCC claim as to California Plaintiffs Mertz and Sawicki for lack of privity. (ECF No. 85, PageID.19478.)

for the ordinary purposes for which such goods are used." Cal. Civ. Code § 1791.1(a)(2). "An unmerchantable vehicle is typically unsafe or not suitable for ordinary use." *Carver*, 328 Cal. Rptr. 3d at 546. Under California law, "a vehicle that is inoperable is unfit for transportation, which is an ordinary purpose for which a vehicle is used," but "a vehicle that is capable of providing transportation from point A to point B does not necessarily fulfill the implied warranty of merchantability." *Gutierrez*, 248 Cal. Rptr. 3d at 75. "Defining the warranty in terms of a vehicle that is 'in safe condition and substantially free of defects' is consistent with the notion that the vehicle is fit for the ordinary purpose for which a vehicle is used." *Isip v. Mercedes-Benz USA, LLC*, 65 Cal. Rptr. 3d 695, 700 (Cal. Ct. App. 2007) (upholding trial court's jury instruction). "Any buyer of consumer goods who is damaged by a failure to comply with any obligation . . . under an implied or express warranty . . . may bring an action for the recovery of damages and other legal and equitable relief." Cal. Civ. Code § 1794(a).

**Indiana**

With respect to the proposed Indiana class, Plaintiffs seek certification for a claim of breach of the implied warranty of merchantability under the Indiana UCC, Ind. Code §§ 26-1-2-101 to 26-1-2-725.

Under Indiana law, any action based on breach of warranty requires evidence showing: (1) the existence of the warranty; (2) that the warranty was breached; and (3) that the breach was the proximate cause of the plaintiff's loss. *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind. Ct. App. 2009). The Indiana UCC provides that "a warranty that the goods shall be merchantable is implied in a

contract for their sale if the seller is a merchant with respect to goods of that kind." Ind. Code § 26-1-2-314(1). The Supreme Court of Indiana has held that "a consumer may sue a manufacturer for economic loss based on breach of the implied warranty of merchantability even if the consumer purchased the product from an intermediary in the distribution chain." *Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 948 (Ind. 2005). For goods to be "merchantable" under the Indiana UCC, the goods "must at least be . . . fit for the ordinary purposes for which such goods are used." Ind. Code § 26-1-2-314(2)(c). "A good may breach the implied warranty of merchantability if it is defective as the result of an imperfection or dereliction." *Irmscher Suppliers*, 909 N.E.2d at 1048. A buyer may recover any consequential damages resulting from a seller's breach with respect to goods, including "injury to person or property proximately resulting from any breach of warranty." Ind. Code § 26-1-2-715(2)(b).

**Louisiana**

With respect to the proposed Louisiana class, Plaintiffs seek certification for two warranty claims under the sales articles of the Louisiana Civil Code, La. Civ. Code Ann. arts. 2520–2548, a claim of breach of the implied warranty of fitness for ordinary use under article 2524, and a claim of breach of the warranty against redhibitory defects under article 2520.

Article 2524, dealing with the implied warranty of fitness, provides that: "The thing sold must be reasonably fit for its ordinary use." La. Civ. Code Ann. art. 2524. "If the thing is not so fit, the buyer's rights are governed by the general rules of conventional obligations." *Id.* Article 2520, dealing with redhibition, provides that: "The seller warrants the buyer against redhibitory defects, or vices, in the thing sold."

*Id.* art. 2520. A plaintiff can establish that a defect is "redhibitory" by proving that "when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price." *Id.* "The existence of such a defect limits the right of a buyer to a reduction of the price." *Id.* "One of the principal elements in formulating a price reduction of the purchase price is the cost of repairs." *Billups v. Lyons*, 821 So. 2d 499, 507 (La. Ct. App. 2002).

As their only argument for pursuing both an implied warranty of fitness claim and a redhibition claim, Plaintiffs cite the *Stone Energy* decision from the District Court for the Western District of Louisiana. As Plaintiffs point out, the district court stated in conclusion that it had decided to allow the plaintiff to pursue the two warranty claims together, on the premise that redhibition does not subsume the implied warranty of fitness in cases involving defective goods. *Stone Energy Corp. v. Nippon Steel*, 475 F. Supp. 3d 563, 576 (W.D. La. 2020). The Court notes that the district court reached this decision only after explaining that interpreting the interaction between the two Civil Code warranties presents an impossible *Erie* guess because the statutory language, remedies, and legislative history create an array of irreconcilable conflicts that Louisiana courts have left unsettled. *Id.* at 571–75. "The logical anomaly is that defective goods under the definition of redhibition will always be unfit for their ordinary use, and goods unfit for their ordinary use will always be defective as defined by redhibition." *Id.* at 571–72. After analyzing the options for interpreting "these troublesome warranties," the district court predicted that the

Louisiana Supreme Court would endorse a textual approach that simply gives meaning to the statutory language. *Id.* at 575. The Court agrees with the district court's analysis and conclusion that, under the textual approach, a plaintiff should be allowed to pursue both an implied warranty of fitness claim and a redhibition claim. *Id.* at 575–76.

**New Jersey**

With respect to the proposed New Jersey class, Plaintiffs seek certification for a claim of breach of the implied warranty of merchantability under the New Jersey UCC, N.J. Stat. Ann. §§ 12A:2-101–725.

The New Jersey UCC provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.J. Stat. Ann. § 12A:2-314(1). The Supreme Court of New Jersey has held that "the absence of privity no longer bars a buyer from reaching through the chain of distribution to the manufacturer." *Alloway v. Gen. Marine Indus., L.P.*, 695 A.2d 264, 275 (N.J. 1997). To establish a claim of breach of the implied warranty of merchantability, a plaintiff must prove: (1) that the seller is a merchant; (2) that the goods were not merchantable at the time of sale; (3) injury and damages to the plaintiff or his property; (4) that the injury was proximately and in fact caused by the defective nature of the goods; and (5) notice to the seller of the injury. *Herbstman v. Eastman Kodak Co.*, 342 A.2d 181, 185 (N.J. 1975). For goods to be "merchantable" under the New Jersey UCC, the goods "must be at least . . . fit for the ordinary purposes for which such goods are used." N.J. Stat. Ann. § 12A:2-314(2)(c). "The implied warranties referred to in the code contemplate no more than

the existence of a defect or condition which causes non-merchantability or non-fitness at the time the product was transferred." *A-Leet Leasing Corp. v. Kingshead Corp.*, 375 A.2d 1208, 1212 (N.J. Super. Ct. App. Div. 1977). "The same proof that establishes a defect in strict liability may also establish that a product is not fit and suitable for the purpose intended and, therefore, constitutes a breach of an implied warranty of fitness and merchantability." *In re Cadillac V8-6-4 Class Action*, 461 A.2d 736, 743 (N.J. 1983). A buyer may recover any consequential damages resulting from a seller's breach with respect to goods, including "injury to person or property proximately resulting from any breach of warranty." N.J. Stat. Ann. § 12A:2-715(2)(b).

**Ohio**

With respect to the proposed Ohio class, Plaintiffs seek certification for a claim of breach of implied warranty in tort (also known as strict liability in tort), often referred to simply as "implied warranty" (or "strict liability").

A series of Ohio Supreme Court decisions extended the UCC's implied warranty protections to "purchasers who are not in privity with the party against whom they seek to assert their claim." *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 865 (S.D. Ohio 2012). In *Lonzrick v. Republic Steel Corp.*, the Ohio Supreme Court extended the "settled law" that "there can be an action in tort, based upon breach of warranty, and [that] no contractual relation between the plaintiff and the defendant is required." 218 N.E.2d 185, 192, 194 (Ohio 1966). A "breach of the representations which are implicit" occurs "when a defendant manufactures and sells a product which, if defective, will be a dangerous instrumentality." *Id.* Next, in *Iacono*

*v. Anderson Concrete Corp.*, the Ohio Supreme Court extended *Lonzrick* beyond personal injuries, holding that "an action in tort, based on the properly pleaded theory of breach of implied warranty, may be maintained to recover for damage to property." 326 N.E.2d 267, 271 (Ohio 1975). Then, in *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, the Ohio Supreme Court explained that the "property" damages at issue in *Iacono* "were in fact merely defects in the product itself which reduced the product's value," and held that "an action in tort for breach of express or implied warranty . . . may be maintained for purely economic loss." 537 N.E.2d 624, 634 (Ohio 1989).

To establish a claim of breach of implied warranty, a plaintiff must prove that: (1) a defect existed in the product manufactured and sold by the defendant; (2) the defect existed at the time the product left the defendant's hands; and (3) the defect directly and proximately caused the plaintiff's injuries or loss. *State Auto Mut. Ins. Co. v. Chrysler Corp.*, 304 N.E.2d 891, 894–95 (Ohio 1973); *Johnson v. Monsanto Co.*, No. 11–02–02, 2002 WL 2030889 (Ohio Ct. App. 2002). "Under Ohio law, a defect is considered to exist in a product which is not of good and merchantable quality, fit and safe for its ordinary intended use." *Temple v. Wean United, Inc.*, 364 N.E.2d 267, 270 (Ohio 1977) (quotation and alterations omitted) (citing *Lonzrick*, 218 N.E.2d at 191). *See also McDonald v. Ford Motor Co.*, 326 N.E.2d 252, 254 (Ohio 1975) ("Under the doctrine of implied warranty, a defect is considered to exist in a product which is not fit for the ordinary purpose for which that product is used.").

**Pennsylvania**

With respect to the proposed Pennsylvania class, Plaintiffs seek certification for a claim of breach of the implied warranty of merchantability under the Pennsylvania UCC, 13 Pa. Cons. Stat. §§ 2101–2725.

To establish a claim of breach of warranty under the Pennsylvania UCC, a plaintiff must prove: (1) the existence of the warranty; (2) a breach of the warranty; (3) that the breach was the proximate cause of the plaintiff's loss; and (4) the amount of damages. *AM/PM Franchise Ass'n v. Atl. Richfield Co.*, 584 A.2d 915, 923 & n.12 (Pa. 1990). The Pennsylvania UCC provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 13 Pa. Cons. Stat. § 2314(a). "For cases involving a breach of the implied warranty of merchantability, any party injured by the defective product may sue any party in the distributive chain." *French v. Commonwealth Assocs., Inc.*, 980 A.2d 623, 633 (Pa. Super. Ct. 2009). For goods to be "merchantable" under the Pennsylvania UCC, the goods "must be at least . . . fit for the ordinary purposes for which such goods are used." 13 Pa. Cons. Stat. § 2314(b)(3). "The concept of 'merchantability' does not require that the goods be the best quality or the best obtainable, but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used." *Gall v. Allegheny Cnty. Health Dep't*, 555 A.2d 786, 789–90 (Pa. 1989) (citations omitted). A buyer may recover any

consequential damages resulting from a seller's breach with respect to goods, including "injury to person or property proximately resulting from any breach of warranty." 13 Pa. Cons. Stat. § 2715(b)(2).

**South Carolina**

With respect to the proposed South Carolina class, Plaintiffs seek certification for a claim of breach of the implied warranty of merchantability under the South Carolina UCC, S.C. Code Ann. §§ 36-2-101 to 36-2-809.

To establish a claim of breach of warranty under the South Carolina UCC, a plaintiff must prove: (1) the existence of the warranty; (2) that the warranty was breached; (3) that the breach caused the plaintiff's loss; and (4) the amount of damages. *See Bell v. Harrington Mfg. Co.*, 219 S.E.2d 906, 907–09 (S.C. 1975) (affirming jury's verdict and damages award for breach of express and implied warranties as supported by sufficient evidence). The South Carolina UCC provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." S.C. Code Ann. § 36-2-314(1). "Goods to be merchantable must be at least . . . fit for the ordinary purposes for which such goods are used." *Id.* § 36-2-314(2)(c). "A plaintiff may establish a breach of this implied warranty by circumstantial evidence." *Doty v. Parkway Homes Co.*, 368 S.E.2d 670, 671 (S.C. 1988). "It is sufficient if the plaintiff presents evidence from which it can be reasonably inferred that the goods were defective at the time the sale was completed." *Id.* A buyer may recover any consequential damages resulting from a seller's breach with respect to goods,

including "injury to person or property proximately resulting from any breach of warranty." S.C. Code Ann. § 36-2-715(2)(b).

**2. California Consumer Protection Claims (CLRA and UCL)**

With respect to the proposed California class, Plaintiffs additionally seek certification for two claims of violation of consumer protection law, one under the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750–1784, and one under the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200–17210.

The Court will focus on the standards governing the CLRA claim. The UCL prohibits "unfair competition," which the statute defines to include "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Here, Plaintiffs indicate that they are asserting an "unlawful" prong UCL claim based on the CLRA claim. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999) ("Because [the UCL] is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent.") (quotation omitted); *Collins v. eMachines, Inc.*, 134 Cal. Rptr. 3d 588, 596 (Cal. Ct. App. 2011) ("In proscribing unlawful business practices, the UCL borrows violations of other laws and treats them as independently actionable."). Plaintiffs refer to the two statutes collectively as "the consumer protection acts," arguing that the standards governing the CLRA claim "apply equally" to the UCL claim and that the UCL claim can be certified for "the same reasons" as the CLRA claim. (ECF No. 144, PageID.27821, 27824–27825.) Accordingly, the Court deems

Plaintiffs to be arguing that the elements of the CLRA claim subsume the elements of the UCL claim.

The purposes of the CLRA are "to protect consumers against unfair and deceptive business practices" and "to provide efficient and economical procedures to secure such protection." Cal. Civ. Code § 1760. The CLRA declares various listed "unfair methods of competition and unfair or deceptive acts or practices" to be "unlawful" when the practices are "undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." *Id.* § 1770(a). Among other listed practices, the CLRA prohibits: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ." *Id.* § 1770(a)(5). Similarly, the CLRA prohibits: "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." *Id.* § 1770(a)(7). The California Court of Appeal has held that "an omission is actionable under the CLRA if the omitted fact is (1) contrary to a material representation actually made by the defendant or (2) is a fact the defendant was obliged to disclose." *Gutierrez*, 248 Cal. Rptr. 3d at 84 (quotations and alteration omitted) (citing *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 126 (Cal. Ct. App. 2006)). The CLRA provides that a consumer "who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful" may bring an action against that person to recover or obtain actual

damages, an injunction, restitution of property, punitive damages, and any other relief that the court deems proper. Cal. Civ. Code § 1780(a)(1)–(5).

To establish a CLRA claim, a plaintiff must show "not only that a defendant's conduct was deceptive but that the deception caused them harm." *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 95 (Cal. Ct. App. 2009) (quotation omitted). "Causation, on a classwide basis, may be established by materiality." *Id.* "If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." *Id.* "Materiality of the alleged misrepresentation generally is judged by a 'reasonable man' standard." *Steroid Hormone Prod. Cases*, 104 Cal. Rptr. 3d 329, 338 (Cal. Ct. App. 2010). "In the CLRA context, a fact is deemed material, and obligates an exclusively knowledgeable defendant to disclose it, if a reasonable consumer would deem it important in determining how to act in the transaction at issue." *Collins*, 134 Cal. Rptr. 3d at 593 (quotations and alteration omitted). *See also In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009) ("A misrepresentation is judged to be material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question . . . .") (quotations omitted).

**B. Commonality**

Under Rule 23(a)(2), a plaintiff seeking class certification must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A common question must 'resolve an issue that is central to the validity of each one of the claims.'" *Speerly*, 143 F.4th at 317 (quoting *Dukes*, 564 U.S. at 350). "A factual

issue will not be 'central' to an aggregate dispute if it does not 'affect at least one element' of the joined claims." *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 246 (6th Cir. 2024) (quoting *Doster v. Kendall*, 54 F.4th 398, 430 (6th Cir. 2022)). "The district court thus must walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common answers." *Id.* at 246–47. For a question to be common, the question must "allow a decisionmaker to reach a yes-or-no answer for the class in 'one stroke.'" *Doster*, 54 F.4th at 430–31 (quoting *Dukes*, 564 U.S. at 350). If the decisionmaker can answer a question "yes" for some class members and "no" for other class members, then the question is not a common question. *Id.* at 431. "So too if different class members must use different pieces of evidence to answer the question." *Nissan*, 122 F.4th at 247 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.") (quotations and alteration omitted).

The Sixth Circuit has specifically instructed district courts on how to conduct the commonality analysis in auto-defect class action cases. *See In re Ford Motor Co.*, 86 F.4th 723, 726–27 (6th Cir. 2023); *Nissan*, 122 F.4th at 245; *Speerly*, 143 F.4th at 318–20. So the Court summarizes those decisions here. In *Ford*, a case involving an alleged brake pedal defect, the automaker supposedly fixed the issue in subsequent model years such that the alleged defect might not have existed in all class vehicles.

The Sixth Circuit vacated the class certification decision and remanded, instructing the district court to "grapple with whether the [changes] made any material difference to the class's alleged defect," leaving open the possibility that "those changes were immaterial, meaning that any defect would persist despite the alterations." *Id.* at 728. In *Nissan*, a case involving an alleged automated braking system defect, the commonality problem was similar, only that the automaker's *proven* software fixes meant that the alleged defect manifested differently across class vehicles. 122 F.4th at 248. Because the software updates "remedied those alleged flaws in some cars," the Sixth Circuit remanded with instructions to "grapple with those updates to answer whether the existence of a defect can be established in one stroke." *Id.* In *Speerly*, a case involving allegedly defective transmissions, the district court identified the issue of "defect" across multiple claims as one common question and certified the class. 143 F.4th 306, 316–317. The Sixth Circuit vacated and remanded with instructions to conduct an "element-by-element analysis that assesses how each question [of defect] is common by fitting it into each claim." *Id.* at 319–20 ("Because 'defect' bears different legal meanings for different causes of action, the class needs to explain how and why class-wide proof of each alleged fault in the transmission resolves a material component of each cause of action.").

With the learnings of all three cases in mind, the Court starts with the essence of this case, Plaintiffs' implied warranty claims.

### 1. Implied Warranty Claims

Plaintiffs argue that the disputed elements are substantially the same across the applicable state law. In a series of repetitive state-by-state arguments, Plaintiffs identify the common questions as being whether the CP4 pump is defective, and whether the defective CP4 pump rendered the Class Vehicles unfit for their ordinary purpose (*i.e.*, unmerchantable). (ECF No. 144, PageID.27810–27813.) Plaintiffs focus in particular on whether the CP4 pump is defective (*id.*), appearing to assume that the commonality of the merchantability question follows from the commonality of the defect question. *See Speerly*, 143 F.4th at 325 ("The court must know whether GM's transmission was defective before it can tell whether that defect rendered GM cars unmerchantable.").

The Court agrees with Plaintiffs and finds that they have met their burden of demonstrating that the defect question is common to the proposed classes for three reasons. First, the defect question is common to all class members and their class vehicles. All class vehicles are equipped with the CP4 pump, and the CP4 pump is allegedly defective in the same way across class vehicles. Specifically, Plaintiffs allege that the CP4 pump has a fragile design prone to failure triggered by any number of foreseeable fuel characteristics. Second, the defect question is central to the implied warranty claims. Specifically, the question of whether the CP4 pump is defective answers the element of breach across the applicable state law on implied warranty of merchantability. Third, the defect question is susceptible to common proof. To prove or disprove the existence of the alleged defect, Plaintiffs and Ford will present the

same class-wide expert testimony from their technical experts, as well as the same class-wide internal Ford documents and warranty data about the CP4 pump. This satisfies commonality. *See, e.g., In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 105 (2019) ("'[F]or purposes of Rule 23(a)(2), even a single common question will do.'") (quotation omitted).

**2. California Consumer Protection Claims**

Next, the California consumer protection statutes. Plaintiffs argue that the elements of the CLRA claim subsume the elements of the UCL claim. (ECF No. 144, PageID.27824.) As to the CLRA claim, in addition to whether the CP4 pump is defective, Plaintiffs identify the common questions as being whether Ford had a duty to disclose the defect, and whether the defect was material to a reasonable consumer. (*Id.* at PageID.27822–27824.)

The Court agrees that these are common to the proposed California class. As Plaintiffs point out, the related issues of causation, materiality, and duty to disclose present class-wide issues susceptible to common proof because the issues are assessed under objective standards.

**3. Ford's Commonality Challenges**

Ford's arguments on commonality fail to persuade.

In opposition, Ford challenges commonality on grounds unrelated to the elements of the claims under the applicable state law. Instead, Ford urges the Court to take a closer look at the evidence. Ford argues, first, that Plaintiffs overlook material design changes to different versions of the CP4 pump, and second, that

Plaintiffs mask multiple theories of defect behind a generalized theory that the CP4 pump is fragile to different fuel characteristics. (ECF No. 163, PageID.40342–40347.) The Court will consider each commonality challenge in turn.

**Design Changes**

With respect to the question of whether the CP4 pump is defective, Ford argues material design changes to different versions of the CP4 pump foreclose any finding of commonality. The parties agree that the three generations of Class Vehicles are equipped with four versions of the CP4 pump, each representing a specific Bosch anti-wear "Robustness Package": the RPx, the RP6, the RP7, and the RP8 pumps. The briefing details the changes and explains how they were intended to improve robustness to low-lubricity fuel, produce higher pressure to keep up with increased power from the diesel engine, and integrate a new anti-wear package to address a biodiesel deposit problem with the RP7 pump that resulted in a safety recall.

Ford believes the design changes defeat commonality across all Class Vehicles. (ECF No. 163, PageID.40342.) In support, Ford argues that each "upgraded" version's "robustness-enhancing" design changes have "transformed" failure rates. (*Id.*, PageID.40342, 40344.) Consequently, a jury could answer the robustness question "yes" for some versions and "no" for other versions. (*Id.* at PageID.40342, 40345.) Plaintiffs disagree, arguing that the design changes are "nominal" and ultimately irrelevant to the question of whether the CP4 pump is defective because they did not "fundamentally" change the allegedly fragile design. (ECF No. 179, PageID.45991.) They believe the four versions of the CP4 pump share the same basic fragile design and the same alleged defect of being prone to failure triggered by any number of

foreseeable fuel characteristics. (*Id.*) At most, Plaintiffs say the four versions would create the need for subclasses, not preclude class certification. (*Id.*)

The Court finds that the design changes are not material to the question of whether the CP4 pump is defective. As Plaintiffs argue, the four versions share the same basic allegedly fragile design. Importantly, Ford does not claim that any design changes involved redesigning the CP4 pump itself. Rather, in describing the design changes, Ford largely points to modifications to existing components and parameters. (*See* ECF No. 162, PageID.38382–38384 (describing "upgraded" version's "robustness-enhancing" design changes using terms of degree (e.g., "improved" coating, "optimized" clearance or geometry, "thicker" or "higher flow" lubrication, "reducing" slippage, "improve[d]" alignment, "minimize" wear, etc.)) (Sealed).)

Plus, Ford's own comparisons suggest that some design changes addressed one alleged failure trigger at the expense of another alleged failure trigger. For instance, Ford points to modifications to a parameter known as the roller/roller shoe clearance. Basically, through the science of hydrodynamics, the thickness of the diesel fuel lubrication layer formed as the roller rotates inside the roller shoe is inversely proportional to the clearance between the two parts. (ECF No. 162-8, PageID.38829 (Edgar Suppl. Report) (Sealed).) In other words, the smaller the clearance, the thicker the lubrication layer. (*Id.*) In a series of "significant" design changes "optimizing" the parameter, Ford describes that the roller/roller shoe clearance was reduced in the RP6 pump and then again in the RP7 pump to improve robustness to low-lubricity

fuel, only to be increased in the RP8 pump to improve robustness to biodiesel deposits. (ECF No. 162, PageID.38382–38384 (Sealed).)

Plus, there are factual disputes over the failure rate calculations. (*Compare* ECF No. 162-10, PageID.38951–38953 (Kuhn Rebuttal Report (calculating failure rate through warranty numbers) (Sealed), *with* ECF No. 162-2, PageID.38466–38467 (Edgar Report) (calculating failure rate through sales of replacement pumps) (Sealed), *and* ECF No. 179, PageID.45991 (arguing that Ford's pattern of refusing to cover repairs under warranty makes its failure rate calculation unreliable).) To the extent failure rates are relevant given that the proposed class is limited to purchasers who experienced a failure, the Court is inclined to give more weight to sales numbers for replacement pumps.

In sum, Ford does not claim that any design changes involved redesigning the CP4 pump itself or that any design changes eliminated failures from occurring. With respect to the question of whether the CP4 pump is defective, the Court finds that the design changes are not material because the four versions share the same alleged defect of being prone to failure triggered by foreseeable fuel characteristics. Accordingly, the design changes made to different versions of the CP4 pump do not change the Court's above finding on commonality.

**Different Fuel Characteristics**

Ford also argues that commonality fails because Plaintiffs mask multiple theories of defect behind a generalized theory that the CP4 pump is too "fragile" to different fuel characteristics. Recall that Plaintiffs' technical expert, Dr. Edgar, compiled a list of allegedly foreseeable failure-triggering fuel characteristics. (ECF

No. 162-8, PageID.38827 (Edgar Suppl. Report) (Sealed).) On the other hand, Plaintiffs argue that "Dr. Edgar's single theory of liability" is that the CP4 pump "is not robust to foreseeable out-of-spec fuel" regardless of whether the fuel is out of spec for containing water, dust, air bubbles, or other contaminants. (ECF No. 179, PageID.45992.) The Court has allowed Dr. Edgar's opinion. The different alleged failure triggers are part and parcel of the same alleged defect of being insufficiently robust or prone to failure triggered by any number of foreseeable fuel characteristics. Accordingly, the alleged fragility to different fuel characteristics does not change the Court's above finding that Plaintiffs have met their burden of demonstrating that the defect question is common to the proposed classes.

Finding at least one common issue of law, Plaintiffs have met Rule 23(a)'s commonality requirement.

### C. Predominance

Next up in the "two-step" approach is predominance. *Speerly*, 143 F.4th at 316. Here, the Court considers whether "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Under this 'more demanding' predominance element, courts must separate issues that a jury can decide for the class (common issues) from those that will require member-by-member decisions (individual issues)." *Clippinger v. State Farm Auto. Ins. Co.*, 173 F.4th 817, 832 (6th Cir. 2026) (internal citation omitted).

In another series of repetitive state-by-state discussions, Plaintiffs re-identify the same common questions to argue that they predominate over any individual

questions. Thus, Plaintiffs argue that the predominating common questions include whether the CP4 pump is defective, as well as whether Ford had a duty to disclose the defect, and whether the defect was material to a reasonable consumer.

Ford argues that predominance is defeated by individual questions of: (1) causation; (2) "use" (*i.e.*, personal vs. business use); (3) damages; (4) arbitration; and (5) time-bars (*i.e.*, statutes of limitation). Below, the Court will consider each of Ford's predominance challenges in turn.

**1. Causation**

With respect to the implied warranty claims, Ford argues that predominance is defeated by individual causation questions.

The parties agree that the causation element of the implied warranty claims is substantially the same across the applicable state law. In simple terms, the causation element requires a plaintiff to prove that a defect caused an injury. But, as even Dr. Edgar acknowledges, customer abuse can cause a pump failure, and there is a level of customer mistreatment beyond which Ford cannot be expected to design against. (ECF No. 148-17, PageID.36798 (Edgar deposition in *Stevens* ("Q: Should [an OEM] be expected to design for an unlimited amount of abuse or neglect? A: . . . there are limits, but I would be . . . hard-pressed to define those.") (Sealed); *id.* at PageID.36811 ("Q: [If] I keep driving, and eventually it gets to a point where I'm derated, and I keep driving, and I ignore the WIF light until the water separator overflows and passes on water to the fuel system. And I keep driving. Is that abuse

that Ford . . . should be expected to design their high-pressure diesel fuel pump for? A. That may be beyond the limit. I will concede that.”).)

Thus, Ford argues that a jury will have to consider at least three causation-related inquiries for each class member: “First, how did the owner treat the vehicle? Second, was that treatment abusive? And third, did that abuse cause the pump failure?” (ECF No. 163, PageID.40349.) Ford believes that answering such questions will require “mini-trials,” that “destroy predominance.” (*Id.* at PageID.40348.)

In supplemental briefing, Ford draws the Court’s attention to the recently decided opinion: *Clippinger v. State Farm Auto. Ins. Co.*, 173 F.4th 817 (6th Cir. 2026) (en banc). In *Clippinger*, plaintiffs alleged that State Farm, in paying policy holders the actual cash value of their damaged cars, consistently underestimated the fair market value of those cars by auto-applying a “typical-negotiation adjustment,” *i.e.* offering lower than the sticker price on the assumption that most consumers negotiate down the price of a used car. *Id.* at 828. The Sixth Circuit concluded that individual issues predominated because determining whether the “typical-negotiation adjustment” undervalued a specific car requires studying the “unique characteristics” of each used car, including the “year, make, model, mileage, options, and overall condition of the vehicle[.]” *Id.* at 832–33. Ford contends that a similar individualized inquiry into each vehicle’s inspection reports, repair bills, individual depositions, and expert analysis are needed to determine whether a pump failure was caused by the alleged defect or extreme customer abuse, thus overwhelming any common inquiries.

Plaintiffs believe Ford has exaggerated the need to resolve such individualized disputes. They argue that predominance is not defeated because the "key liability question" under the alleged theory of defect is "whether the CP4 is insufficiently robust to real-world fuel conditions." (ECF No. 179, PageID.45993.) Simply put, Plaintiffs allege that the CP4 pump "cannot protect itself when needed." (*Id.* at PageID.45994 (quotation omitted).) Plaintiffs argue that the alleged theory of defect is "applicable to all Class Vehicles" because "regardless of what specific contaminant or act preceded a CP4 failure, it should not lead to a costly $9,000+ repair." (*Id.* at PageID.45993–45994.)

True, "courts have noted that breach of warranty suits involving motor vehicles often involve complicated issues of individual causation that predominate over common questions regarding the existence of a defect." *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 511 (S.D.N.Y. 2011) (collecting cases). But those cases deal with common, real-world events that the product is not designed to withstand. *See, e.g.*, *id.* (declining to certify class because individual inquiry into whether a nail puncture, large pothole, vandal slashing tire, or alleged tire defect caused flat tire "swamp[s]" the common questions). Here, the real-world incidents of customer abuse that Ford has identified are precisely the common occurrences that Plaintiffs say the pump should be robust enough to endure, or at the very least, should not result in catastrophic failure and a $9,000 repair. As Plaintiffs' attorney stated at oral argument, it would be understandable if water contamination resulted in a

foreseeable $400 repair bill (e.g., pumping out the bad fuel), but Plaintiffs' theory is that such foreseeable events should not result in a $9,000 repair bill.

While the Court cannot rule out the possibility of some individualized disputes over whether a failure was caused by unforeseeable customer abuse rather than the alleged defect, on the current record, the Court finds that the common question of whether the CP4 pump is defective qualitatively predominates over these individual causation questions. *But see Clippinger,* 173 F.4th at 832–33 (in an "actual cash value" insurance case, Court found individual issues predominated where multiple appraisers made specific calculations based on each vehicle's year, make, model, mileage, and condition). Basically, it appears to the Court that the various customers and their allegedly abusive ways tend to align with the allegedly foreseeable failure-triggering fuel characteristics to create a finite body of individualized disputes. On the premise that the CP4 pump should last for the life of the diesel engine, Plaintiffs allege that Ford should have designed against foreseeable real-world conditions. (ECF No. 162-2, PageID.38479-38480 (Edgar Report) (Sealed).) With respect to the relevant foreseeable real-world conditions, some of the main fuel characteristics that the parties agree can cause the CP4 pump to fail include water contamination, particles, and gasoline/DEF contamination. (ECF No. 162-8, PageID.38827 (Edgar Suppl. Report) (Sealed).) As to water contamination, Ford points to two customers who allegedly neglected to immediately drain the water separator in response to the water-in-fuel light on their dashboard. (ECF No. 163, PageID.40351.) Similarly, as to particles, Ford points to two customers who allegedly neglected to replace dirty fuel

filters. (*Id.*, PageID.40351–40352.) And as to gasoline/DEF contamination, Ford points to three customers who poured allegedly abusive amounts of DEF into the fuel tank, and two more customers who respectively added allegedly abusive amounts of gasoline and gasoline additives to the fuel tank. (*Id.* at PageID.40349–40350, 40352–40353.) Plaintiffs would say that all of these instances exemplify foreseeable customer abuse. And they point to an exemplary customer as "a classic example of the hundreds of thousands of other Class Vehicle owners who experienced CP4 failure through no fault of their own." (ECF No. 179, PageID.45994.)

At bottom, while Ford's basic contention is that customers must correctly take care of their Class Vehicles, Plaintiffs' basic contention is that a small real-world mistake should not result in a $9,000 repair bill. (ECF No. 162-2, PageID.38480 (Edgar Report) (Sealed).) Predominance is a balancing test. After years of discovery, with very real common issues on one side of the ledger (i.e. the core defect issue), the Court cannot allow "'speculation and surmise [regarding unforeseeable customer abuse] to tip the decisional scales in a class certification ruling." *Bridging Communities Inc.*, 843 F.3d at 1125 (internal citation omitted). In other words, Ford has not provided sufficient evidence of the unforeseeable abuse that it warns could bog down the proceedings. So individual questions about causation do not outweigh the common question of whether the CP4 pump is defective.

The Court recognizes that this is a fine line and strong arguments can be made on both sides. *See Clippinger*, 173 F.4th at 832–33. On the record before the Court, Dr. Edgar's opinion supports that the individual causation issue does not

predominate over the common defect issue. Accordingly, the Court finds that Plaintiffs have met their burden of demonstrating that common questions predominate over individual causation questions.

**2. Personal vs Business Use**

With respect to the proposed California class, Ford argues that predominance is defeated by individual "use" (*i.e.*, personal vs. business use) questions. As set forth above, Plaintiffs seek certification for an implied warranty claim under the Song-Beverly Act, as well as two consumer protection claims, one under the CLRA and the other under the UCL. As Ford points out, the Song-Beverly Act and the CLRA both have a personal use requirement. The Song-Beverly Act applies to "consumer goods," defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes," and the CLRA applies to transactions with a "consumer," defined as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code §§ 1791(a), 1761(d).

Ford argues that individual "use" questions defeat predominance because the jury must inquire into each class member's state of mind to determine why they purchased their Class Vehicle. Ford adds that the need for individualized determinations of personal vs. business use looms particularly large in this case because the Class Vehicles are commercial-grade work trucks and the proposed class includes persons "or entities" who purchased them. In reply, Plaintiffs argue that there is no predominance problem because such individualized determinations are

unnecessary when a plaintiff asserts a UCL claim along with a CLRA claim. According to Plaintiffs, this is because the UCL, which prohibits "any unlawful, unfair or fraudulent business act or practice," does not have the same personal use requirement. Cal. Bus. & Prof. Code § 17200.

As discussed, however, Plaintiffs do not indicate that they are asserting anything other than an "unlawful" prong UCL claim based on the CLRA claim. In their motion for class certification, Plaintiffs refer to the two statutes collectively as "the consumer protection acts," arguing that the standards governing the CLRA claim "apply equally" to the UCL claim and that the UCL claim can be certified for "the same reasons" as the CLRA claim. (ECF No. 144, PageID.27821, 27824–27825.)

In any event, Plaintiffs do not push to pursue the UCL claim along with the CLRA claim as a means to include business use purchasers in the proposed California class. Rather, in the event "the Court decides to certify a CLRA/IWM-only class," Plaintiffs inform the Court that "it is free to limit the class definitions to personal use purchasers only." (ECF No. 179, PageID.45995.) In this regard, the Court notes that Plaintiffs do not respond to Ford's below argument that they have not offered a viable class-wide damages model for the UCL claim. While Ford argues that this is the case for both the CLRA claim and the UCL claim, Plaintiffs argue only that "Plaintiffs proffer a viable damages model for their CLRA claims." (*Id.* at PageID.45996.) Accordingly, with respect to the proposed California class, the Court deems Plaintiffs to have withdrawn their request for certification of the UCL claim. In accordance with the personal use requirement of both the Song-Beverly Act and the CLRA, the Court

will modify the class definition to include only purchasers who purchased a Class Vehicle for personal, family, or household purposes.

### 3. Damages

Also with the proposed California class, Ford argues that predominance is defeated by individual damages questions. As a matter of demonstrating predominance under Rule 23(b)(3), the Supreme Court has held that a plaintiff seeking class certification must establish that damages are capable of measurement on a class-wide basis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case . . . ." *Id.* at 35 (quotation and citation omitted). Otherwise, the model "cannot possibly establish that damages are susceptible of measurement across the entire class" and "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 34–35.

Ford argues that individual damages questions defeat predominance because Plaintiffs have not offered a viable class-wide damages model for either the CLRA claim or the UCL claim. As set forth above, the Court has deemed Plaintiffs to have withdrawn their request for certification of the UCL claim. Accordingly, the Court will address Ford's argument as to the CLRA claim. The CLRA provides that a plaintiff who suffers "any damage" as a result of the defendant's violation may recover or obtain actual damages, an injunction, restitution of property, punitive damages, and any other relief that the court deems proper. Cal. Civ. Code § 1780(a)(1)–(5).

Through their damage expert, Plaintiffs offer a cost-of-repair model to calculate the repair costs purchasers paid for failures caused by the alleged defect. They did not put forward an "overpayment" (or benefit-of-the-bargain) model. Ford does not dispute that the cost-of-repair model is appropriate for the implied warranty claims but says that the CLRA claim addresses a "different" harm which demands a "different" remedy. (ECF No. 163, PageID.40355.) In making this point, Ford suggests, without expressly arguing, that the CLRA only provides for overpayment damages, which would leave Plaintiffs with no viable class-wide damages model at all. (*Id.* at PageID.40356.) In reply, Plaintiffs argue that the cost-of-repair model is "viable for calculating class-wide CLRA damages." (ECF No. 179, PageID.45996.)

As their main authority, both parties cite *Nguyen v. Nissan N. Am., Inc.*, in which the Ninth Circuit concluded that the CLRA permits recovery of benefit-of-the-bargain damages. *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817–18 (9th Cir. 2019). In so doing, the court construed the CLRA's "any damage" requirement as "a capacious one that includes any pecuniary damage as well as opportunity costs and transaction costs that result when a consumer is misled by deceptive marketing practices." *Id.* at 818 (quotation and alteration omitted). As Plaintiffs point out, the Ninth Circuit never suggested, much less concluded, that the "capacious" "any damage" standard limits recovery under the CLRA to overpayment damages. Ford offers no other authority to support its position. Accordingly, the Court finds that Plaintiffs have met their burden of demonstrating that common questions predominate over individual damages questions.

**4. Arbitration**

Ford also argues that predominance is defeated by individual arbitration questions. In its answer to the operative pleading, Ford asserts a defense that "[t]he claims of certain Plaintiffs and putative class members may be barred by agreements to arbitrate their claims." (ECF No. 93, PageID.23700.) The arbitration issues in this case were previously briefed by the parties but ultimately decided by arbitrators rather than the Court. Six of the sixteen then-Plaintiffs who engaged in discovery purchased Class Vehicles from dealerships under sales contracts which contain arbitration provisions. After obtaining the arbitration agreements these Plaintiffs signed with dealerships, Ford moved to compel them to pursue their claims in individual arbitration. (ECF No. 103.) Plaintiffs opposed Ford's motion, arguing, among other things, that Ford had waived the right to compel arbitration, and that Ford could not enforce the arbitration agreements. (ECF No. 105.) By stipulation of the parties, the Court stayed this case pending arbitration, including for decisions by the arbitrators on the disputed waiver and enforceability issues. (ECF No. 126.) Ultimately, the Court lifted the stay after the arbitrators found either that Ford had waived reliance on the arbitration agreements through inconsistent litigation conduct (ECF Nos. 132, 134), or that the arbitration agreements were unenforceable (ECF Nos. 133, 135, 136, 137).

Nonetheless, Ford argues that it is still entitled to assert the right to compel the "doubtless many" unnamed class members who signed arbitration agreements with dealerships. (ECF No. 163, PageID.40357.) "If anything," Ford reasons, "the

frequency of arbitration agreements among Named Plaintiffs cherry-picked by counsel *understates* their prevalence among the class." (*Id.*) Ford argues that individual arbitration questions defeat predominance because the Court (or, pursuant to any delegation clauses, arbitrators) must analyze whether Ford can enforce the arbitration agreements as non-signatory under the language of each arbitration agreement and the applicable state law. (*Id.* at PageID.40358.)

For their part, Plaintiffs do not dispute that a substantial number of class members likely signed arbitration agreements with dealerships. (*See* ECF No. 179, pageID.45996–45997.) Plaintiffs argue, however, that predominance is not defeated by individual arbitration questions because (1) Ford waived the right to compel arbitration, (2) Ford cannot enforce the arbitration agreements, and (3) arbitration is an affirmative defense. (*Id.*) Furthermore, Plaintiffs argue that the Court can "avoid any doubt" about a predominance problem by certifying separate classes for purchasers who signed and did not sign an arbitration agreement. (*Id.* at PageID.45997.)

At the outset, the Court finds that Ford's predominance challenge is well-founded. "Because Civil Rule 23 asks only whether common 'questions of law or fact' predominate, it applies to affirmative elements and the 'defenses of the class' alike." *Speerly*, 143 F.4th at 335 (quoting Fed. R. Civ. P. 23(a)(3)). In *Speerly*, the Sixth Circuit provided guidance on conducting the predominance analysis in the context of an automaker's arbitration defense based on arbitration provisions in dealership sales contracts. *Id.* The Sixth Circuit instructed that arbitration bears on the

predominance analysis as "a potential defense" to the class's claims that "raises individualized inquiries of law and fact." *Id.* Since "state law determines when a car manufacturer may benefit from a car dealer's arbitration agreement," analyzing arbitration issues is an "individualized endeavor" that depends on "the number of different arbitration agreements" in the class and requires the district court to "interpret each arbitration agreement" and "identify which ones warrant extension to the class's claims" against the automaker. *Id.* Ultimately, the individual arbitration questions that emerge from the agreement-by-agreement and state-by-state analysis can "overwhelm the common ones" and "bar class certification." *Id.* In accounting for the individual arbitration questions in the class, the district court cannot consider whether the defendant waived the right to arbitrate with unnamed class members, even if the defendant did so with respect to the named plaintiffs. *Id.* at 336 (concluding that, at the class certification stage, a defendant's pre-certification "waiver, or [] voluntary relinquishment of the right to resolve the named plaintiffs' claims by arbitration, does not speak for the unnamed class members.") (quotation and citation omitted).

The Court starts by considering Plaintiffs' argument that Ford waived the right to compel arbitration through inconsistent litigation conduct. Recall that courts infer intent to waive a right when a party has "knowledge of [the right's] existence," and acts "inconsistent with any reliance" on that right. *In Re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 143 F.4th at 723–24 (describing waiver of right to enforce arbitration agreement). Plaintiffs point to *Chapman* where the district court found

that the defendant "acted inconsistently with its arbitration rights and therefore waived them" by "actively participating in litigation for almost four years . . . without once mentioning arbitration as an affirmative defense." *Chapman v. Gen. Motors LLC*, No. 19-12333, 2023 U.S. Dist. LEXIS 98317, at *14–15 (E.D. Mich. June 6, 2023). But, as Plaintiffs acknowledge, *Chapman* came before *Speerly's* instruction that arbitration agreements cannot be waived as to unnamed class members. And, even if *Speerly* allowed such waiver as to the whole class, as the seven dissenting Sixth Circuit judges would have permitted (*see* 143 F.4th at 382–83 (Moore, J., dissenting)), Ford invoked its arbitration rights as to individual named Plaintiffs throughout this case. So there is no room to say that Ford waived an arbitration defense here. And the Court must account for the individual arbitration questions as to the class members they seek to represent.

Plaintiffs' next argument, that Ford's arbitration requests will fail, merely relitigates the merits of their motion to compel brief. In doing so, Plaintiffs remind the Court how complex and fact-dependent such inquires can be. So this argument only helps Ford's predominance challenge by previewing the "individualized endeavor" of analyzing the disputed enforceability issue under the language of each arbitration agreement and the applicable state law. *See Speerly*, 143 F.4th at 335.

Lastly, Plaintiffs' argument that predominance is not defeated because arbitration is an affirmative defense. Without further elaboration, Plaintiffs argue that, for Ford, establishing the right to compel individual class members to arbitration is a "*post-trial* burden" that "has no effect on the conduct of the trial."

(ECF No. 179, PageID.45997.) This fails to persuade. Initially, the Court does not follow how an arbitration defense could be deferred until after trial. "Indeed, as a practical matter, an enforceable contractual right to compel arbitration operates as a quasi-jurisdictional bar to a plaintiff's claims, providing grounds for dismissal of the suit." *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 718 (6th Cir. 2012). Moreover, the Court does not follow why individual arbitration questions are immaterial just because they would not be tried to the jury. According to the plain language of Rule 23(b)(3), the predominance analysis compares common and individual "questions of law *or* fact" in the class, not simply questions of fact for the jury. Fed. R. Civ. P. 23(b)(3) (emphasis added). As instructed by the Sixth Circuit, an automaker's arbitration defense based on arbitration provisions in dealership sales contracts "raises individualized inquiries of law and fact" that can "overwhelm the common ones" and "bar class certification." *Speerly*, 143 F.4th at 335.

But this individual inquiry does not entirely doom class certification. With respect to the proposed class, the Court finds that Plaintiffs have not met their burden of demonstrating that common questions would predominate over individual arbitration questions. Plaintiffs do not dispute that a substantial number of class members likely signed arbitration agreements with dealerships. At this time, however, only the six arbitration agreements that Ford obtained from Plaintiffs during discovery are of record. So the Court is unable to truly account for the individual arbitration questions that would emerge from analyzing the arbitration issues in this case on an agreement-by-agreement and state-by-state basis. At the

same time, the Court is faced with the very real possibility that the individual arbitration questions in the class could overwhelm the common questions, and Plaintiffs have not made a persuasive argument to the contrary. Accordingly, the Court will modify the class definition to include only purchasers who did not sign an arbitration agreement with a dealership.

And it will not recapture the excluded purchasers in a separate class. Plaintiffs suggest such an approach based on the ruling in *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. 119, 129–30 (N.D. Cal. 2025). (ECF No. 179, PageID.45997.). But there, the two classes reflect how the district court used the date the automaker added an arbitration provision to its purchase agreement to ensure the exclusion of purchasers subject to arbitration. *Id.* (certifying a "California Pre-Arbitration Class" ending in May 2017 for purchasers "who are not subject to arbitration" and a "California Arbitration Opt-Out Class" starting in June 2017 limited to purchasers "who opted out of Tesla's arbitration agreement").

While Plaintiffs also cite *Speerly*, the Court does not interpret the Sixth Circuit's guidance as suggesting a "bifurcation" approach in the context of this case. As Plaintiffs point out, the Sixth Circuit stated that, if a fraction of the dealership sales contracts contained arbitration provisions, then the arbitration agreements "would require the district court to bifurcate the class into the [percentage] who must proceed through arbitration, and the [percentage] who may proceed through trial." *Speerly*, 143 F.4th at 335. As such, the Sixth Circuit did not conclude that the arbitration agreements precluded class certification. At the same time, the Sixth

Circuit was not instructing the district court to proceed with certifying a separate class for purchasers subject to arbitration, much less suggesting that doing so would avoid the predominance problem. Rather, the Sixth Circuit remanded for "further proceedings over whether questions of arbitrability bar class certification" with instructions to "decide in the first instance whether arbitration questions overwhelm the common ones in this class." *Id.* Here, Plaintiffs have not met their burden of demonstrating predominance with respect to a class that includes a substantial number of purchasers subject to arbitration, and the same is all the more true of a separate class including only those purchasers.

**5. Statute of limitations**

Ford argues that predominance is defeated by individual time-bar questions. Ford explains that the claims for which Plaintiffs seek certification have one-to-six year statutes of limitation. Ford acknowledges that Plaintiffs intend to prove class-wide tolling of the statutes of limitation by presenting evidence that Ford continues to deny the existence of the alleged defect. However, Ford argues that, even if class-wide tolling applies, predominance is defeated by the need to resolve individualized issues. For each class member who experienced a pump failure, Ford argues that the jury must determine when the failure occurred to put them on actual notice of the alleged defect and/or evaluate their reasonable diligence in discovering the alleged defect.

In reply, Plaintiffs argue that there is no predominance problem because resolving such individualized issues is unnecessary when a plaintiff alleges a theory

of class-wide tolling. Ford does not cite any authority or offer any non-speculative explanation for the proposition that individualized issues over actual and/or discovery notice would become overwhelming even if class-wide tolling applies. Additionally, "differences among the applicable statute of limitations periods are not a bar to class certification and, therefore, is not a basis for finding that common issues do not predominate . . . ." *Steigerwald v. BHH, LLC*, No. 15 741, 2016 WL 695424, at *9 (N.D. Ohio Feb. 22, 2016); *see also Lauber v. Belford High Sch.*, No. 09-14345, 2012 WL 5822243, at *9 (E.D. Mich. Jan. 23, 2012) ("the law is settled that '[t]he existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones.'") (internal citation omitted).

Accordingly, the Court finds that Plaintiffs have met their burden of demonstrating that common questions predominate over individual time-bar questions.

**D. Superiority**

As the second requirement for maintaining a Rule 23(b)(3) damages class, the Court finds that Plaintiffs have met their burden of establishing that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The factors pertinent to the superiority requirement include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

With respect to the first factor, class members are unlikely to pursue individual actions. As Plaintiffs point out, for individual class members, the amount of recovery would be dwarfed by the cost of litigation, particularly given the need for expert analysis to prove that the CP4 pump is defective. (ECF No. 144, PageID.27827.) While Ford argues that individual litigation with fee-shifting would be superior to a class action (ECF No. 163, PageID.40359), the Court is not persuaded. As the sole individual action against Ford over the CP4 pump, Ford cites the *Clark* case, where the parties recently stipulated to dismissal. *See Clark v. Ford Motor Co.*, No. 23-11744 (E.D. Mich. filed July 20, 2023) (Michelson, J.). As Plaintiffs point out, *Clark* is "piggybacking" on this case. As explained by Plaintiffs, this includes "sharing more than 39,000 discovery documents from this case, at least 12 Ford witness depositions from this case, and the exact same experts across both cases (including largely recycled opinions from both sides' experts), all of which are prohibitively expensive for an individual suit." (ECF No. 179, PageID.46000.)

The other factors weigh in favor of a class action. This case is the only multistate class action against Ford over the CP4 pump. The predominating common questions, including whether the CP4 pump is defective, can be efficiently resolved on a class-wide basis. And the Court finds that proceeding with a class action

involving the limited causes of action for the seven state-specific proposed classes would not present any significant manageability problems.

**E. Adequacy**

Under Rule 23(a)(4), a plaintiff seeking class certification must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). While the commonality and typicality requirements "tend to merge" with the adequate representation requirement, inasmuch as it is distinct, the adequate representation requirement "raises concerns about the competency of class counsel and conflicts of interest." *Gen. Tel. Co.*, 457 U.S. at 157 n.13. The Sixth Circuit has "articulated two criteria for determining adequacy of representation: 1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (quotation omitted).

In their motion for class certification, Plaintiffs argue that the adequate representation requirement is satisfied as to both the proposed class representatives and the proposed class counsel. (ECF No. 144, PageID.27813.) They submit that "[t]he proposed Class representatives here have common interests with their Classes, and have pledged to dutifully prosecute the case with counsel." (*Id.* at PageID.27814 (citing ECF No. 144-8, PageID.28860–28861 (Berman Decl.)).) Among other things, Plaintiffs explain that the proposed class representatives have sat for depositions, participated in document review and document production, and made efforts to stay

up to date in this case, and that each "has stated and testified they are willing to continue to participate in the case." (ECF No. 144-8, PageID.28860 (Berman Decl.).) With respect to the law firms of (i) Hagens Berman Sobol Shapiro LLP, (ii) Hilliard Law, and (iii) The Miller Law Firm P.C., Plaintiffs further submit that their "counsel have demonstrated vigorous and effective prosecution on behalf of the proposed Classes, including conducting a comprehensive pre-filing investigation, preparing and filing detailed complaints, responding to Ford's motion to dismiss, reviewing tens of thousands of documents, and hiring multiple highly qualified experts to determine liability, causation, and damages theories." (ECF No. 144, PageID.27814 (citing ECF No. 144-8, PageID.28860 (Berman Decl.); ECF No. 144-9, PageID.28953–28954 (Hilliard Decl.); ECF No. 144-10, PageID.28975 (Miller Decl.)).)

Ford does not really dispute these points. It challenges the adequacy of certain proposed class representatives and proposed class counsel on other grounds. And in light of Ford's recall reimbursement for RP7 vehicles, it challenges the named Plaintiffs' ability to represent these individuals. The Court addresses each argument in turn.

**1. Proposed Class Representatives**

First, Ford argues that California Plaintiff Joseph Sawicki[2] and New Jersey Plaintiff Jay Eriv are not adequate representatives for the proposed California and

[2] The Court will disregard Ford's argument as to California Plaintiff Curtis McNeal Mertz, since Plaintiffs refute the stated premise of Ford's argument. *Compare* ECF No. 163, PageID.40361 (Ford listing Mertz among "No-Repair plaintiffs with no concrete injury"), *with* ECF No. 179, PageID.45998–45999

New Jersey classes. Indeed, Ford argues that Sawicki and Eriv are doubly inadequate because they do not have Article III standing and because they are not members of the proposed classes.

At the outset, the Court notes that Ford is correct to point out that these Plaintiffs are not members of the proposed classes. The proposed classes include persons who, first, "purchased" Class Vehicles, and second, "have paid" out-of-pocket repair costs. Plaintiffs do not dispute that neither Sawicki nor Eriv purchased the at-issue Class Vehicle. (ECF No. 179, PageID.45999.) For Sawicki, his wife purchased the class vehicle, and for Eriv, his separately incorporated company purchased the class vehicle. (*Id.*) Moreover, Plaintiffs do not dispute that Sawicki has not experienced a failure and thus has not paid repair costs. (*Id.*) And while he experienced a failure, Plaintiffs do not dispute that Eriv did not pay the repair costs—his company, the entity that purchased the Class Vehicle, did. (*Id.*; ECF No. 163, PageID.40361.)

These Plaintiffs, therefore, also lack standing because they have not suffered an injury in fact. As discussed, anyone who has not yet experienced a pump failure has not yet paid out-of-pocket repair costs and thus has not suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotations and citations omitted). In the context of challenging adequate representation, Ford

---

(Plaintiffs listing Mertz among Plaintiffs who "*did* have failures, as Ford knows"). The Court addresses' Mertz' claim in more detail in the summary judgment opinion.

focuses on the concreteness requirement as to Sawicki and the particularization requirement as to Eriv. The Supreme Court has instructed that concreteness and particularization are two independent requirements. *Spokeo v. Robins*, 578 U.S. 330, 339–40 (2016). For an injury to be particularized, the injury must "affect the plaintiff in a personal and individual way." *Id.* at 339 (quotation omitted). On the other hand, concreteness requires an injury to be "*de facto*," that is, to "actually exist," meaning that the injury must be "real" and not "abstract." *Id.* at 340 (quotations omitted). For the same reasons the Court reached the same conclusion as to future repair class members, the Court agrees with Ford that Sawicki has not suffered a concrete injury because he has not experienced a failure. And Eriv has not suffered a particularized injury because he did not pay the repair costs.

Because they do not have standing and lack class membership, the Court finds that Plaintiffs have not met their burden of demonstrating adequacy of representation as to Sawicki and Eriv. On the other hand, the Court finds that Plaintiffs have otherwise met their burden of demonstrating adequacy of representation as to the proposed class representatives. As a final matter, the Court will address the impact on class certification. With respect to Sawicki, the Court's finding of inadequacy does not defeat the proposed California class for which an additional named Plaintiff, Mertz, also seeks appointment as class representative. With respect to Eriv, however, the Court's finding of inadequacy precludes class certification for the proposed New Jersey class, for which no other named Plaintiff seeks appointment as class representative.

Next, as the Court concludes in its summary judgment opinion, Sonja Bauers (Indiana), did not file her claim within the applicable statute of limitations. And she did not show that equitable tolling applied to her claim. Thus, Bauers is dismissed from the suit and cannot serve as an adequate class representative for the Indiana class. With no other named class representative, this finding precludes class certification for the Indiana class.

**2. Proposed Class Counsel**

With respect to the law firms generally, Ford points out that two then-Plaintiffs testified at their depositions that they never agreed to join this case. (ECF No. 163, PageID.40362.) Plaintiffs, for their part, attribute this matter partly to "mistaken memories." (ECF No. 179, PageID.46001.) After reviewing the record, the Court considers this matter resolved. Ford raised this issue with the Court in May 2024 by moving for leave to depose all twenty-seven of the then-former Plaintiffs to investigate the possibility of misconduct. (ECF No. 117.) Plaintiffs opposed Ford's motion, arguing, among other things, that a substantial document trail refuted the deposition testimony. (ECF No. 120.) By stipulation of the parties, the Court granted Ford leave to depose six of the former Plaintiffs, without prejudice to seeking leave to depose additional former Plaintiffs if the depositions suggested any misconduct. (ECF No. 127.) Ford took no further action after taking the agreed-upon depositions. So this does not give the Court reason to find class counsel inadequate.

With respect to Hagens Berman in particular, Ford points to two lawsuits pending in other district courts, both of which involve sanctions, and one of which

further involves a referral to the Department of Justice for criminal investigation, against the law firm. But the Court is in no position to take a side on these pending, fact-intensive, and apparently strongly disputed matters. The Court notes in particular that Hagens Berman explains that its positions have drawn support from prominent ethics experts and a former federal district judge. (ECF No. 179-1, PageID.46010–46012 (Berman Decl.).) Because Ford does not otherwise dispute the qualifications of the law firms, the Court finds that Plaintiffs have met their burden of demonstrating adequacy of representation as to the proposed class counsel.

**3. RP7 Model Class Members**

Ford raised an additional argument in supplemental briefing. (ECF No. 190.) In January 2026, Ford recalled all RP7-model Class Vehicles, promising reimbursements for "repair costs associated with failures of one variant of the CP4 diesel fuel pump that had a distinct susceptibility to biodiesel deposit accumulation." (*Id.* at PageID.46337.) But none of the named class members have this specific pump model. Ford believes that RP7 class members are "already entitled to all the relief that the Named Plaintiffs seek," and will only incur additional expense by staying in the litigation. (ECF No. 190-1, PageID.46340.) Thus, Ford believes the named class representatives cannot adequately represent the RP7 plaintiffs entitled to recall reimbursement.

Plaintiffs see it differently. They argue that "the scope of the reimbursement plan" is "limited to those who can prove their vehicle contains specific diagnostic trouble codes" and "those who had the repair done at a Ford dealership." (ECF No.

191, PageID.46384–46385.) And to the extent that a potential plaintiff has been fully reimbursed for out-of-pocket expenses, Plaintiffs contend that these individuals are excluded from the class definition. (ECF No. 191, PageID.46386.)

Plaintiffs have the better of the argument here. And to steer clear of any ambiguity, the Court will clarity that Class members already reimbursed by Ford for out of pocket repair expenses are excluded from the class.

## VI. Conclusion

For the reasons stated in this opinion and order, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for class certification and appointment of class representatives and class counsel (ECF No. 144, 143 (Sealed)).

It is hereby **ORDERED** that the following classes are **CERTIFIED**:

> 1. California Class. All persons or entities who purchased one or more of the Class Vehicles in California for personal, family, or household purposes, did not sign an arbitration agreement with a dealership, and have paid out of pocket for a CP4 repair.
>
> 2. Louisiana Class. All persons or entities who purchased one or more of the Class Vehicles in Louisiana, did not sign an arbitration agreement with a dealership, and have paid out of pocket for a CP4 repair.
>
> 3. Ohio Class. All persons or entities who purchased one or more of the Class Vehicles in Ohio, did not sign an arbitration agreement with a dealership, and have paid out of pocket for a CP4 repair.
>
> 4. Pennsylvania Class. All persons or entities who purchased one or more of the Class Vehicles in Pennsylvania, did not sign an arbitration agreement with a dealership, and have paid out of pocket for a CP4 repair.
>
> 5. South Carolina Class. All persons or entities who purchased one or more of the Class Vehicles in South Carolina, did not sign an arbitration agreement with a dealership, and have paid out of pocket for a CP4 repair.

It is further **ORDERED** that Model Year 2011-present Ford Power Stroke 6.7L diesel trucks are **DESIGNATED** as Class Vehicles.

It is further **ORDERED** that the following Plaintiffs are **APPOINTED** as representatives for the classes: (1) California Plaintiff Curtis McNeal Mertz for the California class; (2) Louisiana Plaintiffs Joey Angona and Jeffrey A. Ford for the Louisiana class; (3) Ohio Plaintiff Matthew Parker for the Ohio class; (4) Pennsylvania Plaintiff Trevor Wentz for the Pennsylvania class; and (5) South Carolina Plaintiff Keith Williams for the South Carolina class.

It is further **ORDERED** that the law firms of (i) Hagens Berman Sobol Shapiro LLP, (ii) Hilliard Law, and (iii) The Miller Law Firm P.C. are **APPOINTED** as class counsel for the classes.

It is further **ORDERED** that counsel for the parties shall meet and confer and present to the Court within thirty (30) days after entry of this opinion and order a proposal for notice to class members for the classes that complies with Federal Rule of Civil Procedure 23(c)(2)(b) and a method of delivering the notice to absent class members.

It is further **ORDERED** that Ford's MOTION for Leave to File Fourth Notice of Supplemental Authority (ECF No. 198) is GRANTED.

IT IS SO ORDERED.

Dated: September 30, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE